# EXHIBIT Q

Fulton County Superior Court
***EFILED***MH
Date: 12/15/2020 2:37 PM
Cathelene Robinson, Clerk

# IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

|  |  |  |
|---|---|---|
| DONALD J. TRUMP, in his capacity as a Candidate for President, et al., | ) ) ) | |
| Petitioners, | ) ) ) | |
| v. | ) ) | |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, et al., | ) ) ) ) ) | Civil Action No. 2020CV343255 |
| Respondents. | ) ) ) | |

## <u>RESPONDENTS BRAD RAFFENSPERGER, REBECCA N. SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN, AND ANH LE'S MOTION TO EXCLUDE AFFIDAVITS AND TESTIMONY OF PETITIONERS' EXPERTS</u>

Respondents Brad Raffensperger, Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and Anh Le ("State Respondents")[1] move this Court for an order excluding the affidavits and testimony of Petitioners' purported expert witnesses, Matt Braynard ("Braynard"), Bryan Geels ("Geels"), and Mark Alan Davis ("Davis"). These witnesses are not qualified to offer expert testimony and their testimony is not based on any reliable scientific methodology. Their opinions are wholly speculative and assume illegality when other innocuous explanations they ignore easily explain the data they claim to identify. The Court should exclude these witnesses because they are not experts and their inadmissible opinions are not scientific, probative or relevant.

---

[1] Respondents have not been served with the Petition as required by O.C.G.A. §§ 9-11-4 and 21-2-524(f), and therefore personal jurisdiction over them has not been established in this Court. Accordingly, Respondents file this Motion to Exclude by Special Appearance only, and do not waive the required statutory service or their jurisdictional defenses.

## I.   <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Petitioners' counsel retained Matt Braynard, Bryan Geels, and Mark Alan Davis to offer several affidavits that Petitioners use to claim "thousands of unqualified persons" registered to vote and voted in the November 3, 2020, general election in Georgia.  Geels and Davis actually say no such thing, and Braynard's conclusions are self-contradictory or unsupported by any scientific reasoning whatsoever.  Moreover, Braynard subsequently disavowed any suggestion that he is accusing any person of voting illegally, even though he swore to this Court that he was. *Compare* Elections Investigative Hearing: Georgia House of Representatives, Hearing before the Comm. on Governmental Affairs (Dec. 10, 2020), at 1:30:52 - 1:31:13, https://livestream.com/accounts/25225474/events/9117221/videos/214677184 ("In my affidavit I don't believe I specifically accuse anybody of committing any crime. I said these were indications—over and over again potentially illegal ballots has been my language. Uh indications of illegally cast ballots. I have not accused anybody of committing a felony in any of my . . . affidavits or declarations.") *with* Affidavit of Matt Braynard ("Braynard Aff.") at ¶ 12 ("In total, it is my opinion that **there were 20,312 individuals who cast ballots illegally** in the November 3, 2020 election due to their loss of residency status in the State prior to the election.").

Braynard, Geels, and Davis are not experts in the subject matters of their testimony.  None have any relevant education, training, skill, or experience. Where their methodology is discernable at all, they use methods that are not standard or trusted in the relevant field.  Each also either restates publically available data (which is not proper for an expert) or draws conclusions from it that are, at best, pure speculation.  The Court should exclude Petitioner's junk science because it

is not probative of any relevant issue and does not satisfy the requirements of O.C.G.A. § 24-7-702 or the standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[2]

## II.     ARGUMENT AND CITATION OF AUTHORITY

O.C.G.A. § 24-7-702 governs the admissibility of expert testimony in Georgia.  Subsection 24-7-702(b) provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if:
>
> (1)   The testimony is based upon sufficient facts or data;
>
> (2)   The testimony is the product of reliable principles and methods; and
>
> (3)   The witness has applied the principles and methods reliably to the facts of the case which have been or will be admitted into evidence before the trier of fact.

This statute requires the Court to act as "gatekeeper to ensure the relevance and reliability of expert testimony." *Scapa Dryer Fabrics, Inc. v. Knight*, 299 Ga. 286, 289 (2016).  "[T]he trial court must consider (a) the qualifications of the expert; (b) the reliability of the testimony; and (c) the relevance of the testimony." *Cash v. LG Electronics, Inc.*, 342 Ga. App. 735, 737 (2017) (citing *Scapa Dryer Fabrics*, 299 Ga. at 289).  Petitioners' "experts'" affidavits and testimony are inadmissible because the purported experts are not qualified to offer them, they are unreliable, they are irrelevant, and they accordingly fail to satisfy the requirements of O.C.G.A. § 24-7-702(b) and the standards of *Daubert* and its progeny.

---

[2] In interpreting and applying section 24-7-702, Georgia courts are specifically authorized to draw from the opinions of the United States Supreme Court in *Daubert*; *General Electric Co. v. Joiner*, 522 U.S. 136 (1997); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U. S. 137 (1999); and other federal court cases applying the standards announced in these cases. *See* O.C.G.A. § 24-7-702(f).

Braynard offers four opinions, all of which are not supported by proper methodology, are wrong and unfounded: (a) some absentee or early voters were no longer Georgia residents because they registered to vote in another state after they registered in Georgia, even if this subsequent registration occurred years ago; (b) some voters "may have" vacated their Georgia residence as evidenced by their filing a Notice of Change of Address ("NCOA") form to an out-of-state address, even though NCOA's can, and often are, filed for temporary moves ; (c) some early and absentee ballots were cast by people who were "illegally registered," although not necessarily ineligible to vote, because they allegedly listed a post-office box as their address and; (d) a few hundred people allegedly voted in Georgia and in another state.  *See* Petition at ¶¶ 73, 76, 82, 87.

Petitioners rely on Geels to provide estimated numbers of voters who allegedly were felons with uncompleted sentences, underage, dead, not registered, improperly registered, or who improperly applied for or received or returned absentee ballots.  *See id.* at ¶¶ 61, 64, 67, 94, 101, 103, 119, 123, 126, 129, 131, 134, 137.  Geels's testimony seeks to turn minor data anomalies into widespread voter fraud when the anomalies he identifies actually prove the opposite when placed into their statistical context.  Petitioners rely on Davis's Affidavit to show the estimated numbers of voters who moved to another county and had not changed their registration to their new county of residence.  *See id.* ¶ 85. None even acknowledge alternative causes for the statistical conclusions they reach, let alone attempt to explain these alternatives.

Dr. Charles Stewart is the Kenan Sahin Distinguished Professor at the Massachusetts Institute of Technology.  Declaration of Charles Stewart III ("Stewart Decl."), attached as **Exhibit A** at ¶ 2.  Among other degrees, he has a Ph.D in political science from Stanford University.  *Id.* at ¶ 3.  He researched and taught graduate and undergraduate courses in American politics, research methodology, elections and legislative politics.  *Id.* at ¶ 2.  Among other things, he is the founding

director of the MIT Election Data and Science Lab, which is dedicated to the impartial analysis of elections and election administration in the United States. *Id.* at ¶ 5. He is widely published in many peer-reviewed publications. *Id.* at ¶ 6. He has also been accepted as an expert witness in three federal cases that involved record linkage and matching between voter files and other data sources, such as driver's license files. *Id.* at ¶ 7.

Dr. Stewart has reviewed the Braynard, Geels and Davis Affidavits. His assessment of their proffered testimony is discussed more fully below and a more detailed discussion is contained in his Declaration. Initially, all three of Petitioners' experts rely on matching Georgia voter files with other data files in a manner that is "[k]nown to be unreliable and to produce a preponderance of 'false positives.'" *Id.* at ¶ 13. Indeed, even the most sophisticated methodology used by any of these experts—Braynard's alleged use of actual birthdates as opposed to birth years—is "highly inaccurate." *Id.* at ¶ 31. Because voter files are so large (Georgia's contains over 7 million people), even looking only at Georgia, there will be many voters who share the same name and the same birth date. *Id.* Braynard neither acknowledges the possibility of false matches, nor discusses any means by which he sought to control for them to confirm the "matches" he bases his opinions on are correct. *Id.* at ¶ 33. The improper methodology used by Braynard renders his conclusions unreliable and without merit. *Id.* at ¶13.

Geels makes some of the same data-matching mistakes as Braynard. Geels's first affidavit inspects Georgia voter files and uncovers anomalies within those files. These "anomalies" are generally "minor typographical and clerical errors that are neither signs of fraudulent behavior nor lax electoral controls." Stewart Decl. at ¶ 14. His larger so-called anomalies prove only that Geels does not understand Georgia law. *Id.* In fact, all Geels does is determine that approximately 300,000 Georgians legally availed themselves of Georgia law which allows them to request one

absentee ballot for a primary and general election.  Stewart Decl. at ¶ 66.  His second affidavit takes reduced absentee ballot rejection rates (a good thing) and spins them into nefarious election interference by fiat.  Stewart Decl. at ¶ 90.  Similarly, Davis provides virtually no details of what "analysis" he even performed and comes to no relevant conclusions whatsoever.  Stewart Decl. at ¶ 16.

### A.    Petitioners' "Experts" Are Not Qualified.

To determine an expert's qualifications, the Court must examine the credentials of each expert "to ascertain the extent to which he is qualified to testify competently regarding the matters he intends to address, whether by knowledge, skill, experience, training, or education."  *Scapa Dryer Fabrics*, 299 Ga. at 289 (citation and punctuation omitted).  None of Petitioners' purported experts is qualified to testify competently regarding the matters addressed in their affidavits.

### 1.    Matt Braynard.

Braynard claims to be an "election data analyst."  Braynard's own resume proves he is not an election data analyst.  Affidavit of Matt Braynard ("Braynard Aff.", Ex. 2 to Petition) at ¶ 3, Ex. 1.  Braynard has a bachelor's degree in business administration and a master's degree in fine arts in "writing program."  *See id*., Ex. 1.  Braynard has no experience, training, or education in political science, statistics, database matching or survey design, nor does he list any publications, research projects, or speaking engagements on those or any other subjects.  He is not a statistician, mathematician, or political scientist; he has no apparent expertise in linking and analyzing complex databases; he has no apparent training or expertise in survey-based research; he has no peer-reviewed publications relating to election data or data analysis; and he has never been qualified as an expert witness in any matter in any court.

Braynard's resume reveals he is a partisan political consultant who worked on various Republican campaigns and served as the director of the "Data Division" for President Trump's

6

2016 campaign.  *See id.*  After working for the 2016 Trump campaign, he spent four years as executive director of an organization called Look Ahead America, working with over 30 other former Trump campaign staffers with the apparent goal of registering and turning out likely Trump voters.  *See id.*  In addition to the $40,000 Petitioners have paid him in this matter (*see id.* ¶ 9), Braynard has personally received almost $675,000 on behalf of his "Voter Integrity Project." *See* Voter Integrity Project, GiveSendGo Campaign (https://givesendgo.com/voterintegrity); Matt Braynard, Gab (Nov. 16, 2020) (https://gab.com/mattbraynard/posts/105223610078696550) (noting Braynard's refusal to publicly disclose invoices for purported expenditures).[3]  Braynard's "Voter Integrity Project" includes former Trump campaign staff and current White House staff and government officials, including a senior advisor to President Trump whom Trump appointed as the federal government's chief information security officer, who are currently engaged in an effort to "hunt for fraud" in the 2020 election.  *See* Ellie Rushing & William Bender, "Pro-Trump 'voter integrity' group that is calling Pennsylvania voters has ties to White House," *Philadelphia Inquirer* (Nov. 13, 2020) (https://www.inquirer.com/politics/pennsylvania/voter-integrity-fund-pennsylvania-georgia-wisconsin-trump-2020-20201113.html) ("*Philadelphia Inquirer* Report"); Jon Swaine & Lisa Raine, "The federal government's chief information security officer is helping an outside effort to hunt for alleged voter fraud," *Washington Post* (Nov. 15, 2020) (https://www.washingtonpost.com/politics/trump-voter-integrity-fund/2020/11/15/89986f1c-25fe-11eb-952e-0c475972cfc0_story.html); Jon Swaine, Rosalind S. Helderman, Josh Dawsey & Tom Hamburger, "Conservative nonprofit group challenging election results around the country has tie to Trump legal adviser Jenna Ellis," *Washington Post* (Dec. 7, 2020)

---

[3] Braynard's GoFundMe money collection effort was taken down by GoFundMe because Braynard "was spreading misinformation about the 2020 Election." https://news.yahoo.com/gofundme-takes-down-conservative-fundraiser-020829908.html

(https://www.washingtonpost.com/politics/thomas-more-jenna-ellis/2020/12/07/09057432-362d-11eb-b59c-adb7153d10c2_story.html); http://twitter.com/MattBraynard.   Braynard admits his group is in frequent communication with the Trump campaign and that it has provided the campaign with its research.  *See Philadelphia Inquirer* Report.

Braynard has no expertise in matching data across large, disparate sources to determine voter eligibility like he attempted to do here.  He is a partisan operative, patently unqualified to offer the purported "opinions" set forth in his Affidavit.

2.   Bryan Geels.

Geels purports to be "an expert in data analysis and statistics."  Affidavit of Bryan Geels ("Geels Aff. 10", Ex. 10 to Petition) at ¶ 1.  He purports "to provide a summary of election data compiled by the State of Georgia" and opine on his analysis of the State's "database" for the November 3, 2020, presidential election; whether voters identified in the database were qualified to vote; and "the quality" of the data on which Georgia elections officials relied.  *See id.* at ¶ 3; Affidavit Bryan Geels ("Geels Aff. 3", Ex. 3 to Petition) ¶ 1.

Geels is actually an accountant who owns a business consulting company in Seattle, Washington.  *See* Geels Aff. 3 at ¶ 6.  Like Braynard, Geels is not a statistician, mathematician, or data analyst; he does not have any apparent training or expertise in survey-based research; he does not purport to have any expertise in linking and analyzing complex databases.  Like Braynard, he has no education or experience in political science, statistics, or survey design, and he has been involved in no publications, research projects, or speaking engagements on those or any other subjects.  He has no peer-reviewed publications relating to election data or data analysis, and he has never been qualified to serve as an expert witness in any matter in any court.  *See id.* at ¶¶ 8, 10.

Geels admits the data he reviewed in forming his "opinions" are "easily accessible" and "public and publicly available online." He claims that the data are "fairly simple to comprehend" such that "[t]he Court or opposing counsel can easily repeat this process." Geels Aff. 10 at ¶¶ 4, 6, 7; Geels Aff. 3 at ¶¶ 3, 4. Geels admits he "did not create or compile the source of the data," but he contends he is "familiar with accessing files on the internet generally" and he is "proficient" and "an expert working with" common business software applications. Geels Aff. 10 at ¶ 5; Geels Aff. 3 at ¶ 7. He admits his summaries of the data are "helpful" only "because the data files are voluminous and cannot be conveniently examined …." Geels Aff. 10 at ¶ 8.

It does not take any specialized "knowledge, skill, experience, training, or education" to access data files from the internet, which is what Geels claims he has done in his Affidavits. O.C.G.A. § 24-7-702(b). Anyone with an internet connection and a basic understanding of Microsoft business software can do what Geels claims to have done. As a 32 year old accountant, Geels is patently not qualified to offer expert testimony in election data or election data analysis, and his testimony should be excluded.

### 3. Mark Alan Davis.

Davis's Affidavit is so hopelessly vague that it is impossible to determine from it the area of "specialized knowledge" in which Davis even purports to be an expert. It fails to state his educational or employment background, except to state Davis is "the President of Data Productions, Inc." Affidavit of Mark Alan Davis ("Davis Aff.", Exhibit 4 to Petition) at ¶ 4. Data Productions, Inc. is a direct marketing and advertising firm in Georgia. *See* https://www.dataproductions.com/main. Davis's current employment has nothing to do with election or voter data analysis.

Davis says he has "been working with Georgia voter data for more than thirty (30) years." *Id*. But he fails to explain what "working with" such data means, what kind of data he claims to

9

have "worked with" and what he did with this unidentified data.  He says he created "an enhanced version of the Georgia Voter Database which has been used by numerous campaigns and other organizations over the years."  *Id*. at ¶ 5.  But he fails to explain what that database is, which campaigns allegedly used it, where or when or for what purpose.  He also fails to show the relevance of that database to Petitioners' claims.  Because of this "experience," Davis claims to "have become aware of numerous issues regarding residency and redistricting." *Id*. at ¶ 6.  "Awareness," however, does not equate to expertise.  Nevertheless, Davis claims to have "been brought in as an expert witness in a total of five (5) election disputes."  *Id*. at ¶ 7.  He does not identify those alleged "disputes", what kind of "disputes" they were, the forum in which they were brought, when they were brought, or the parties who "brought [him] in" and for what purpose.

Like Braynard and Geels, Davis is not a statistician, mathematician, or data analyst; he does not have any apparent training or expertise in election data research or analysis; he does not purport to have any expertise in linking and analyzing complex databases.  Like Braynard and Geels, Davis has no apparent education or experience in political science, statistics, or survey design, and he has been involved in no publications, research projects, or speaking engagements on those or any other subjects.  He has no peer-reviewed publications relating to election data or data analysis, and he does not show that he has ever been qualified to serve as an expert witness in any matter in any court.

Petitioners apparently rely on Davis's Affidavit only to show the estimated numbers of voters who allegedly moved to another county in Georgia and yet voted in their former county. *See* Petition at ¶ 85.  Even if it were relevant, which it is not, Davis's purported "opinions" can easily be compiled by anyone with an internet connection.  Davis is patently not qualified to offer expert testimony in election data or election data analysis, and his testimony should be excluded.

**B.       Petitioners' "Experts'" Opinions Are Unreliable.**

Even if Braynard, Geels, and Davis were qualified, which they are not, their "opinions" would still be inadmissible because they are not the product of reliable methodology.  To assess the reliability of an expert's opinions, the trial court must consider whether the conclusions of the expert are based upon sufficient facts or data, whether the expert drew those conclusions by use of reliable principles and methods, and whether the expert applied those principles and methods reliably to the facts of the case.  *See* O.C.G.A. § 24-7-702(b); *Scapa Dryer Fabrics*, 299 Ga. at 289.

> Generally, reliability is examined through consideration of many factors, including whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training.

*Cash*, 342 Ga. App. at 737 (quoting *Old Republic Nat. Title Co. v. RM Kids, LLC*, 337 Ga. App. 638, 647 (2016)).

To be reliable "[a]n expert's methodology must be consistent with the 'methods and procedures of science' rather than being founded on 'subjective belief or unsupported speculation.'" *Inam Int'l, Inc. v. Broan-Nutone LLC*, No. 1:05-CV-0852-CAP, 2007 WL 4730649, *7 (N.D. Ga. Sept. 21, 2007) (quoting *Daubert*, 509 U.S. at 592); *see also Moon v. Advanced Med. Optics, Inc.*, No. 4:08-CV-0021-HLM, 2010 WL 11500906, *11 (N.D. Ga. Sept. 10, 2010) (excluding expert's testimony that was based on "unfounded or unspecified" assumptions).  "To be reliable, the testimony 'must be supported by appropriate validation – i.e., 'good grounds,' based on what is known.'"  *Id.* (quoting *Daubert*, 509 U.S. at 590).

"Importantly, a trial court is not permitted to 'admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too

great an analytical gap between the data and the opinion proffered.'" *Cash*, 342 Ga. App. at 737

(quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)).   "That is precisely the problem

with the expert[s'] methodology in this case."  *Cash*, 342 Ga. App. at 737.

Petitioners' purported experts' utter lack of qualifications seriously undermines the

reliability of their opinions in this case.  For this reason alone their opinions and testimony are

unreliable and must be excluded.  *See Cash*, 342 Ga. App. at 737 (among factors to be examined

in assessing reliability is purported expert's range of experience and training).

In addition, Braynard, Geels, and Davis's "opinions" lack the reliable scientific

methodology required by section 24-7-702 and *Daubert*.  Braynard, Geels, and Davis applied no

discernable specialized knowledge in reaching their "opinions."  Simply collecting, sorting,

comparing and commenting on data sources in the form of a narrative is not admissible under

O.C.G.A. § 24-7-702.

This is especially true where the "experts" made no effort to determine whether factors

other than alleged illegality could account for the conclusions reached in their affidavits.  *Raskin*

*v. Wyatt Co.*, 125 F.3d 55, 67-68 (2d Cir. 1997) (excluding statistical analysis for assuming

anomalies in the data were caused by discrimination but making no attempt to account for other

possible causes); Fed. R. Civ. P. 702 (2000 amendment) (expert must adequately account for

alternative explanation, and at a minimum, must rule out the most obvious ones).  Every number

put forth by Petitioner's so-called experts can be explained by false matches in their data matching,

data entry error in the files themselves, or by legal explanations allowing the activity Braynard,

Geels and Davis criticize.  Petitioners' mere recitation of statistics "is not a magical incantation

paving the way to the witness stand."  *Pugliano v. United States*, 315 F. Supp. 2d 197, 200 (D.

Conn. 2004).   This is particularly true when the statistics they rely on are highly likely to be false, or explained by perfectly legal activity these witnesses ignore.

Braynard, Geels and Davis all use database matching that relies on procedures "[k]nown to be unreliable and to produce a preponderance of 'false positives'."   Stewart Decl. at ¶ 13.[4]   For example, Braynard attempts to match individuals from Georgia voting files to individuals in data files provided by the United States Post Office.   "Record linking" is known to be error prone, particularly when individuals are not matched with unique personal identifiers such as social security numbers or driver's license numbers.   Stewart Decl. at ¶ 43.   Braynard admits he did not have this information, but justifies his analysis by incorporating dates of birth, at least for some of his "analysis."   He does not identify the source of his dates of birth, let alone establish its accuracy. Moreover, even if the dates he uses are accurate, using names and birth dates is "the most unreliable matching method that is known to experts."   Stewart Decl. at ¶ 28.   Geels and Davis make the same methodological mistakes as Braynard.   Stewart Decl. at ¶¶ 14, 16.

Date of birth matching, the most sophisticated method used by Braynard, is actually "highly inaccurate" because voter files are so large (Georgia's contains over 7 million people). There are many voters that share the same name and the same birth date.   Stewart Decl. at ¶ 31. For example, Dr. Stewart analyzed the Georgia voting records and found over 65,000 Georgia residents who share a first name, middle name, last name and birth year with at least one other

---

[4]   Much of the data underlying these experts' "opinions" is also unreliable and inadmissible hearsay.   O.C.G.A. § 24-7-703 allows an expert witness to base his opinions on otherwise inadmissible facts or data, but when inadmissible evidence is used, a danger exists of section 24-7-703 improperly becoming a backdoor hearsay exception.   Braynard, Geels, and Davis fail to demonstrate the underlying data and information on which they base their "opinions" is of a type reasonably relied upon by experts in the fields of statistics, mathematics, and election data analysis, particularly to the extent these experts are merging information from one dataset to another. Merely parroting hearsay information and data from other sources stretches the boundaries of section 24-7-703.

Georgia voter.   Stewart Decl. at ¶ 38.  Braynard's matching problems are compounded exponentially when applied across larger data files, such as the voting files of 49 other states, or the United States Post Office's NCOA database that contains approximately 160 million people and businesses.

Braynard, Geels and Davis provide no explanation of how they are ensuring the names in the various data sets used were matched accurately or for estimating the numbers of voters who were purportedly ineligible to vote.   Nor do any of these experts show how the methodology employed comports with generally accepted practices among experts in the relevant fields of statistics, mathematics or election data analysis.   This is because their methods do not comport with such practices.  Their unscientific methodologies, to the extent they exist at all, invalidate all their "opinions."

1.     Matt Braynard's Specific Opinions Are Inadmissable.

Braynard offers three opinions:   (1) "there were 20,312 individuals who cast ballots illegally in the November 3, 2020 election due to their loss of residency status in [Georgia] prior to the election;" (2) "1,043 early and absentee ballots were cast by voters who were illegally registered using a post office box disguised as a residential address;" (3) and "at least 395 individuals in the State of Georgia voted in multiple states."  Braynard Aff. at ¶¶ 12-14.  None of these opinions are admissible, or correct factually or legally.[5]

For example, Braynard's conclusions that "20,312 or more individuals" voted illegally because they were no longer residents of Georgia is misleading and wrong.  Braynard reached this conclusion by identifying two categories of people:   (a) 4,926 absentee or early voters who

---

[5]   Braynard's allegations concerning the post office boxes and alleged double voters are inadmissible because they are not based on science or a proper methodology.  The explanation of why is contained in Stewart's Declaration at paragraphs 41-50.

registered to vote in another state at any time after they initially registered in Georgia and; (b) 15,700 voters who he claims "may have" vacated their Georgia residence by filing a notice of change of address with the Post Office.  Braynard Aff. at ¶ 12.

Filing a change of address also does not make a voter ineligible to vote in Georgia because they still could be residents of Georgia.  Affidavit of Chris Harvey, attached as **Exhibit B,** at ¶ 4(j) (noting college students, members of the military, people on temporary work assignment, those caring for a loved one, people with second homes all could move out of state temporarily but still retain Georgia residency).  Additionally, voters who moved out of Georgia within 30 days prior to the election are still permitted to cast Georgia ballots in the November 3, 2020, election.  *See* 52 U.S.C. § 10502(e).[6]

Similarly, registering to vote in another state does not necessarily render an individual ineligible to vote in the Georgia November 3 election.  Exh. B at ¶4(i).  Obviously, a person could register in Georgia, move, register in another state, then move back to Georgia.  The Georgia Secretary of State may show her original registration date unless it was cancelled.  *Id.* at ¶ 4(i).  Braynard ignores this possibility.  For example, the second line of Exhibit 2 to his affidavit lists a person originally registered in Georgia in 1980 whom Braynard claims then registered to vote in another state in 1983.  Braynard assumes illegality and makes no effort to control for the obvious possibility that the person moved back to Georgia in the 37 years intervening years after she registered in another state.

---

[6]  *See, e.g.*, "Voter Registration – Information on Federal Enforcement Efforts and State and Local List Management," U.S. Gov't Accountability Office Report (June 2019) at 48-49 (https://www.gao.gov/assets/710/700268.pdf) ("[A]n indication of a change in address in NCOA data does not necessarily reflect a change in residence.").

Indeed, Braynard makes no effort to determine whether any of the people he identified in Exhibit 2 to his Affidavit still live in Georgia.  A cursory investigation shows many likely do.  Of the 48 lines on the first page of Braynard's Exhibit 2, there is evidence that at least 38 of them are currently living in Georgia.  Exh. B at 4(k)-(m), Exhibit 1.  This cursory review shows Braynard's exhibits likely contain many false positives and certainly prove he has undertaken no effort to ensure the allegations he makes are accurate.

Braynard's willingness to accuse over 20,000 Americans of committing voter fraud (then walking that allegation back the first time he was questioned about it) without undertaking any effort to validate his so-called research, coupled with his failure to even acknowledge, let alone eliminate, these obvious alternative explanations is simply not science.[7]  Because Braynard's "opinions" lack any indicia of reliability, they are not the product of a reliable methodology and are thus inadmissible for any purpose.

2.      Bryan Geels's Specific Opinions Are Inadmissible.

In his Affidavit attached to the Petition as Exhibit 3, Geels purports to show the estimated numbers of voters in Georgia who allegedly were ineligible to vote in the 2020 general election.  Geels's Second Affidavit attached to the Petition as Exhibit 10, to the extent it offers any opinions at all, is even more objectionable.  Exhibit 10 summarizes publicly available data to show the rejection rates of mail-in ballots in Georgia for election years 2016, 2018, and 2020.  *See* Geels

---

[7] Braynard's affidavit submitted in this politically fraught case accuses over 20,000 Americans of committing voter fraud, a felony.  Braynard identifies these Americans by name in the spreadsheets attached to his affidavit and expressly accuses them of committing a crime, which he then immediately walked back before the Georgia House of Representatives. Braynard's sworn testimony here is both false and wholly unsupported. The Court should strike all scandalous references to a named individual from Braynard's Affidavit and its exhibits under O.C.G.A. § 9-11-12(f).  *See Chappuis v. Ortho Sport & Spine Physicians Savannah, LLC,* 305 Ga. 401 (2019) (standard to strike is relaxed for scandalous matter because courts recognize the importance of not giving such allegations unnecessary notoriety).

Aff. 10 at ¶¶ 3, 7.  Geels falsely posits that the lower rejection rate for mail in ballots in the 2020 election compared to prior years proves there was inadequate election supervision in 2020.

Like Braynard, Geels, an accountant, makes no effort to show any methodology he employed comports with generally accepted practices or that his methodology has been tested or subjected to peer review and publication.  *See Cash*, 342 Ga. App. at 737.  He, like Braynard, also fails to account for factors other than illegality that would explain his summary results.  By way of example, Geels accuses 305,701 individuals in the Absentee Ballot files of illegality by supposedly requesting absentee ballots more than 180 days before the presidential election.

However, under Georgia law, requesting an absentee ballot prior to May 6, 2020 does not necessarily render that individual ineligible to vote in Georgia.  Exh. B at ¶ 5(d).  O.C.G.A. §21-2-381(B) and (D) and O.C.G.A. §21-2-219 allow certain categories of voters to request their ballots more than 180 days before the election.  These people include voters who are over the age of 65, physically disabled, in the military, or overseas.  Geels makes no reference to this fact, let alone make any attempt to correct for it.  Indeed, Dr. Stewart analyzed similar data to conclude that "Geels has not uncovered anything remarkable at all, other than over 300,000 people who are over 65, disabled, or living overseas availed themselves of a feature of Georgia election law that is made known to every voter who requests an absentee ballot."  Stewart Decl. at ¶ 66.

The other aspects of Geels's first affidavit does nothing more than point out various anomalies in dates within the data files he searched, which together amount to 7,681 voters with anomalous dates.  *See* Geels Aff. 3 at ¶¶ 12-30; Stewart Decl. at ¶ 56.  By ignoring the statistical context in which these anomalies are found, Geels turns these molehills not into mountains, but into fractionally larger molehills.  In a voter file with over seven million records, 7,681 anomalous dates equates to 0.1% of dates.  In files that contain over 55 million dates, the anomalies identified

by Geels equal 0.01% of dates.  In short, Geels's analysis is more easily explained by typographical errors in one of every 15,000 dates entered rather than some illegal act by a Georgia voter or election official, both of whom are presumed to act legally.  Stewart Decl. at ¶ 58.  Geels's refusal to even acknowledge, let alone explain why typographical errors are not an alternative cause of the anomalies he found renders his opinions inadmissible.  *Raskin*, 125 F.3d at 67-68.[8]

Geels's second affidavit focuses on so-called rejection rates of absentee ballots compared to prior years.  He states the rate of rejection of mail-in ballots in the 2020 general election was 0.34%, whereas "Georgia's historical mail-in ballot rejection rate [is] 2.90%-3.46%."  Geels Aff. 10 at ¶¶ 13, 16, 17.  Geels concludes the application of Georgia's "historical mail-in ballot rejection rate" "could have definitely changed the outcome" of the 2020 presidential election in Georgia. *Id*. at ¶ 20.  This is rank speculation.

Geels assumes past rejection rates are set in stone, and that any deviation from those past rates can only be explained by improper actions by state election officials reviewing the absentee ballots.  Either deliberately or through ignorance, Geels applies no "expertise" to explain the context in which these numbers arise.  For example, Georgia's absentee ballot rejection rate in 2016 was the highest in the country, falling to the 11th highest in 2018.  Stewart Decl. at ¶ 92-94. In response, in 2019 the Georgia General Assembly passed HB 316 which provided a mechanism by which absentee voters could cure decencies in their absentee ballot.  This change in the law,

---

[8] Geels's claim that over 10,000 deceased individuals may have cast a ballot in the November 3 election is particularly spurious, although even Geels acknowledges there may be false positives in this analysis.  Geels Aff. 3 at ¶50.  Geels relied exclusively on publicly available data sets that included birth year, not full birth dates.  Dr. Stewart studied this and his conclusion was that he would "expect 11,572 registered voters in Georgia to share the same first and last name of another voter in the state who died."  Stewart Decl. at ¶ 22.  In other words, Geels appears to have identified the unremarkable fact that some Georgians who voted share the name and birth year of a different person who died.

coupled with other developments, including extensive voter education efforts, reduced Georgia's absentee voter rejection rate to less than 1%, a rate consistent with other the rates in many other states.  Stewart Decl. at ¶ 90.

Reducing the number of rejected Georgia votes is a good thing, not evidence of some nefarious plot by election workers as Geels assumes without evidence.  Even if there was some problem with state election officials counting more legal votes in 2020, Geels's "opinions" on the rejection rate of absentee ballots makes no effort to correct for or explain potential alternative causes beyond illegality.  These opinions also lack any indicia of reliability and are not the product of a reliable methodology and are inadmissible under O.C.G.A. § 24-7-702.

### 3.   Mark Alan Davis's Opinions Are Inadmissible.

Davis, who works for a direct marketing firm, submitted an affidavit that revealed he applied no discernable scientific methodology at all.  To form his "opinions" as to the estimated numbers of voters who had moved to another Georgia county, had not changed their voter registration, and voted in their former county, Davis merely cross-referenced information he received from NCOA records with information in Georgia's voter registration records.  *See* Davis Aff. at ¶¶ 8, 18.  His use of the NCOA records suffers from the same problems as Braynard.  He estimates 14,980 Georgia voters who submitted change of address forms voted in the general election.  *See id*. at ¶ 21.  While he, unlike Geels, at least acknowledges that "[s]ome of those" voters "no doubt" are students and military persons who are still permitted to vote in Georgia, he makes no effort to quantify them and exclude those voters from his estimate.  *See id*. at ¶ 20.  He estimates 40,279 Georgia voters moved to another county and allegedly voted in their old county, and he "think[s] it highly likely the vast majority are not temporary."  *Id*. at ¶ 26.  But he does not show why he "think[s]" this is so.  He also posits no theory on how a Georgia voter who votes in

a presidential election from the wrong county, although still in Georgia, could improperly effect on the outcome of the presidential election.[9]

Like Braynard and Geels, Davis provides no explanation of his methodology for ensuring names in the various data sets he used were matched accurately or for estimating the numbers of voters who were purportedly ineligible to vote.  Nor does he make any effort to show any methodology he employed comports with generally accepted practices among experts in the relevant fields of statistics, mathematics, and election data analysis.  Put simply, Davis's report is not science.  Because Davis's "opinions" lack any indicia of reliability, they are not the product of a reliable methodology and are thus inadmissible under O.C.G.A. § 24-7-702.

### C.      Petitioners' "Experts'" Opinions Will Not Assist the Trier of Fact.

To be admissible, expert testimony must be not only reliable, but relevant.  *See Daubert*, 509 U.S. at 597.  "To properly be admissible, expert testimony must assist the trier of fact to understand the evidence or to determine a fact in issue, and expert testimony is helpful to the trier of fact only to the extent that 'the testimony is relevant to the task at hand and logically advances a material aspect of the case.'"  *Scapa Dryer Fabrics*, 299 Ga. at 290 (quoting *Boca Raton Community Hosp. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) (punctuation and citation omitted).

### 1.      The Subject Matter of the "Experts'" Testimony Is Not Beyond the Understanding of the Average Lay Person.

To be helpful to the trier of fact, the expert testimony must "concern[] matters that are beyond the understanding of the average lay person."  *Magbegor v. Triplette*, 212 F. Supp. 3d 1317, 1325 (N.D. Ga. 2016) (quoting *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir.

---

[9] Voters who moved from one city or county to another within Georgia after October 5, 2020, continued to be eligible to vote in the city or county where they were registered to vote, either in person or by absentee ballot.  *See* O.C.G.A. § 21-2-218(e).

2004)).  "[E]xpert opinions that are simply a recitation of historical facts based on information conveyed by others, merely a restatement of information available from other sources, or consist almost entirely of parroting of evidence from other sources do not aid the trier of fact."  *Pledger v. Reliance Trust Co*., No. 1:15-CV-4444-MHC, 2020 WL 6101409, *8 (N.D. Ga. Jan. 24, 2020) (citations and punctuation omitted); *see also In re BankAtlantic Bancorp, Inc. Sec. Litig*., No. 07-61542-CIV, 2010 WL 6363027, *7 (S.D. Fla. Sept. 9, 2010) ("To the extent [the expert's] opinion … is merely a restatement of information available from other sources, it does not assist the trier of fact.").  In short, to be helpful to the trier of fact, an expert must actually draw on his expertise in reaching his conclusions and must testify to something more than what the trier of fact can understand or decide for itself.

As discussed above, Geels admits he "did not create or compile the source of the data" on which his "opinions" are based, and he admits his "opinions" are nothing more than restatements of information "easily accessible" from other public and online sources.  Geels Aff. 10 at ¶¶ 4, 6; Geels Aff. 3 at ¶¶ 3, 4.  Geels merely downloaded information from the internet and received information from other public sources and then loaded it into a "widely-used" Microsoft business analytics software tool that he used to search the information.  *See* Geels Aff. 10 at ¶ 7; Geels Aff. 3 at ¶ 4.  Geels admits the data he "examined" "are fairly simple to comprehend." He claims "the Court or opposing counsel can easily repeat this process."  Geels Aff. 10 at ¶ 7.  Critically, he admits his summaries of the data are "helpful" only "because the data files are voluminous and cannot be conveniently examined …."  *Id*. at ¶ 8.  Without applying any expertise to the data to reach his conclusions, Geels's testimony presents nothing more than what the trier of fact can understand or decide for itself.

Braynard's and Davis's "opinions" are also mere restatements of information publicly available from other sources.  Braynard formed his "opinions" by reviewing and cross-referencing information publicly available from Georgia's and other states' voter registration records, a commercial campaign and voter data vendor, NCOA records, and information "freely available for download from the US Postal Service website".  *See* Braynard Aff. at ¶¶ 5, 15-24.  Davis also formed his "opinions" as to the estimated numbers of voters who had moved to another Georgia county and had not changed their voter registrations merely by cross-referencing information he received from NCOA records with information in Georgia's voter registration records.  *See* Davis Aff. at ¶¶ 8, 18.  Any lay person with an internet connection and a rudimentary understanding of basic Microsoft business software can access, organize, and understand the information Petitioners' purported experts reviewed and summarized and on which they base their "opinions." That Petitioners submitted affidavits from some similar laypersons and called them "experts" does not make their opinions relevant.

2.      The "Experts'" Testimony Will Not Help the Trier of Fact Determine any Fact in Issue.

In order to prevail in this action, Petitioners "must show a specific number of illegal or irregular ballots or a specific number of voters who voted illegally or were irregularly recorded or rejected."  *Martin v. Fulton County Bd. of Registration & Elections*, 307 Ga. 193, 223 (2019) (quoting *Howell v. Fears*, 275 Ga. 627, 627-28 (2002) (election "contestor must affirmatively show that a sufficient number of voters voted illegally or were irregularly recorded"), and *Middleton v. Smith*, 273 Ga. 202, 203 (2000)) (punctuation omitted).  "It is not sufficient to show irregularities which simply erode confidence in the outcome of the election.  Elections cannot be overturned on the basis of mere speculation or an appearance of impropriety in the election procedures."  *Middleton*, 273 Ga. at 203 (citations omitted); *see also Martin*, 307 Ga. at 222

(same).  Petitioners' "experts'" opinions are irrelevant because they are expressly speculative, stated in terms of possibility, do not affirmatively show specific numbers of electors who voted illegally so as to change the result of the election, and thus will not assist the trier of fact.

For instance, Geels does not say votes cast in various "buckets" are illegal, but merely that they are "questionable" (Geels Aff. 3 at ¶¶ 35-44, 46), "extremely questionable" (*id.* at ¶ 47), or "extremely risky" (*id.* at ¶ 49).  Geels identifies other categories of voters as to which his search results might include "false positives," and he notes the reliability of his results "could be improved" with a full analysis conducted by the State.  *Id.* at ¶¶ 28, 29; *see also id.* at ¶ 50 (noting possibility of "false positives" in his search results and that "[o]nly the State possesses the full birth date records for its voters and could conduct the full analysis with certainty"), ¶ 51 (same).  Davis's entire Affidavit addresses bare numbers and speaks in terms of what he "thinks" was "highly likely," what "probably" occurred, what "appears to [him]" to have occurred, and what "[he] can only imagine" occurred.  Davis Aff. at ¶¶ 26, 34.  Geels's and Davis's Affidavits are devoid of anything affirmatively showing specific numbers of illegal or irregular votes, and their speculation as to illegal votes is completely irrelevant in an election contest.[10]

Braynard, Geels, and Davis's "opinions," therefore, will not assist the trier of fact to understand the evidence or to determine a fact in issue, they do not concern matters beyond the understanding of the average lay person, and they are simply restatements of information available

---

[10] Braynard vacuously states his "opinions" as to allegedly illegal votes in more definite terms but, as shown above, he is woefully unqualified to offer any such opinions, he applied no discernable methodology in reaching them, and they are devoid of any basis in fact.  Braynard's "opinions," therefore, will no more assist the trier of fact than Geels's or Davis's.  Moreover, to the extent Petitioners seek to use Braynard's affidavit as proof of illegal votes, Braynard himself disavowed such use in testimony before the Georgia General Assembly.  *See* Elections Investigative Hearing: Georgia House of Representatives, Hearing before the Comm. on Governmental Affairs (Dec. 10, 2020), at 1:30:52 - 1:31:13 (saying he was not actually accusing anyone of committing a crime) https://livestream.com/accounts/25225474/events/9117221/videos/214677184.

from other sources.  For this additional reason, Braynard, Geels, and Davis's testimony does not satisfy the requirements of O.C.G.A. § 24-7-702 or the standards of *Daubert* and must be excluded.

### III.   CONCLUSION

For the foregoing reasons, Respondents respectfully request the Court to exclude Braynard, Geels, and Davis's Affidavits, opinions, and testimony from pretrial proceedings and the trial of this case in their entirety.

Respectfully submitted this 15th day of December, 2020.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene S. McGowan
Assistant Attorney General
Georgia Bar No. 697316
**OFFICE OF THE ATTORNEY GENERAL**
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia, 30334
Telephone: (404) 458-3600
Facsimile: (404) 657-8733

*/s/ Christopher S. Anulewicz*
Christopher S. Anulewicz
Georgia Bar No. 020914
James L. Hollis
Georgia Bar No. 930998
Jonathan R. DeLuca
Georgia Bar No. 228413
Jena C. Lombard
Georgia Bar No. 213734
Patrick N. Silloway
Georgia Bar No. 971966
**BALCH & BINGHAM LLP**

24

30 Ivan Allen Jr. Blvd. N.W., Suite 700
Atlanta, GA 30308
Telephone: (404) 261-6020
Facsimile: (404) 261-3656

*Attorneys for Respondents Brad Raffensperger,
Rebecca N. Sullivan, David J. Worley, Matthew
Mashburn, and Anh Le*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of December, 2020 I electronically filed the foregoing with the Clerk of Court using the Odyssey eFileGA efiling sytem, which will automatically send email notifications of such filing the following counsel of record:

### <u>Attorneys for Petitioners</u>

Ray S. Smith, III
SMITH & LISS, LLC
Five Concourse Parkway
Suite 2600
Atlanta, GA 30328
*Attorney for Petitioners Donald J.*
*Trump and Donald J. Trump for*
*President, Inc.*

Mark C. Post
MARK POST LAW, LLC
3 Bradley Park Court
Suite F
Columbus, GA 31904
*Attorney for Petitioner David J. Shafer*

Kurt R. Hilbert
THE HILBERT LAW FIRM, LLC
205 Norcross Street
Roswell, GA 30075
*Attorney for Petitioners*

### <u>Attorneys for Intervenor-Defendants Biden Electors</u>

Halsey G. Knapp, Jr.
Joyce Gist Lews
Susan P. Coppedge
Adam M. Sparks
KREVOLIN AND HORST, LLC
One Atlantic Center
1201 W. Peachtree Street, NW
Suite 3250
Atlanta, GA 30309

Marc E. Elias
Amanda R. Callais
Jacob D. Shelly
PERKINS COIE LLP
700 Thirteenth Street, NW
Suite 800
Washington, DC 20005-3960

Kevin J. Hamilton
Stephanie R. Holstein
Thomas J. Tobin
Heath L. Hyatt
PERKINS COIE LLP
1201 Third Avenue
Suite 4900
Seattle, WA 98101

Jessica R. Frenkel
PERKINS COIE LLP
1900 Sixteenth Street
Suite 1400
Denver, CO 80202-5255

**Attorneys for Intervenors Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda, James Woodall, and Helen Butler**

William V. Custer
Jennifer B. Dempsey
Christian J. Bromley
BRYAN CAVE LEIGHTON PAISNER
LLP
One Atlantic Center
Fourteenth Floor
1201 W. Peachtree Street, NW
Atlanta, GA 30309

Kristen Clarke
Jon Greenbaum
Ezra Rosenberg
Julie M. Houk
John Powers
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street, NW
Suite 900
Washington, DC 20005

**Attorneys for Intervenor John Wood**

Todd A. Harding
MADDOX & HARDING, LLC
113 E. Solomon Street
Griffin, GA 30223

Erick G. Kaardal
MOHRMAN, KAARDAL &
ERICKSON, P.A.
150 South Fifth Street
Suite 3100
Minneapolis, MN 55402

**Attorney for Intervenor Sean Draime**

Paul Kunst
PAUL C. KUNST PC
941 Thomaston Street
Barnesville, GA 30204

**Attorney for Respondent Ameika Pitts**

Patrick D. Jaugstetter
JARRARD & DAVIS, LLP
222 Webb Street
Cumming, GA 30040

**Attorney for Respondent Erica Hamilton**

Irene B. Vander Els
Shelley D. Momo
DEKALB COUNTY LAW DEPARTMENT
1300 Commerce Drive, 5th Floor
Decatur, GA 30030

**Attorneys for Respondent Janine Eveler**

Daniel W. White
Gregg E. Litchfield
HAYNIE, LITCHFIELD & WHITE, P.C.
222 Washington Avenue
Marietta, GA 30060

**Attorney for Respondent Anne Dover**

Anne S. Brumbaugh
LAW OFFICE OF ANN S. BRUMBAUGH, LLC
309 Sycamore Street
Decatur, GA 30030

**Attorneys for Respondent Kristi Royston**

Melanie F. Wilson
Tuwanda Rush Williams
GWINNETT COUNTY DEPARTMENT OF LAW
75 Langley Drive
Lawrenceville, GA 30046

**Attorneys for Respondent Shauna Dozier**

John R. Hancock
A. Ali Sabzevari
FREEMAN MATHIS & GARY LLP
661 Forest Parkway, Suite E
Forest Park, GA 30297

**Attorneys for Respondent Richard Barron**

Kaye Woodard Burwell
Cheryl Ringer
David R. Lowman
OFFICE OF THE COUNTY ATTORNEY
141 Pryor Street, S.W.
Suite 4038
Atlanta, GA 30303

*/s/ Christopher S. Anulewicz*
Christopher S. Anulewicz
Georgia Bar No. 020914

28

# EXHIBIT A

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| DONALD J. TRUMP, in his capacity as a Candidate for President, DONALD J. TRUMP FOR PRESIDENT, INC., and DAVID J. SHAFER, in his capacity as a Registered Voter and Presidential Elector pledged to Donald Trump for President,<br><br>      Petitioners,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, REBECCA N. SULLIVAN, in her official capacity as Vice Chair of the Georgia State Election Board, DAVID J. WORLEY, in his official capacity as a Member of the Georgia State Election Board, MATTHEW MASHBURN, in his official capacity as a Member of the Georgia State Election Board, ANH LE, in her official capacity as a Member of the Georgia State Election Board, RICHARD L. BARRON, in his official capacity as Director of Registration and Elections for Fulton County, JANINE EVELER, in her official capacity as Director of Registration and Elections for Cobb County, ERICA HAMILTON in her official capacity as Director of Voter Registration and Elections for DeKalb County, KRISTI ROYSTON, in her official capacity as Elections Supervisor for Gwinnett County, RUSSELL BRIDGES, in his official capacity as Elections Supervisor for Chatham County, ANNE DOVER, in her official capacity as Acting Director of Elections and Voter Registration for Cherokee County, SHAUNA DOZIER, in her official capacity as Elections Director for Clayton County, MANDI SMITH, in her official capacity as Director of Voter Registration and Elections for Forsyth County, AMEIKA PITTS, in her official | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 2020CV33255<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**capacity as Director of the Board of**                                )
**Elections & Registration for Henry County,**       )
**LYNN BAILEY, in her official capacity as**          )
**Executive Director of Elections for**                    )
**Richmond County, DEBRA PRESSWOOD,**        )
**in her official capacity as Registration and**      )
**Election Supervisor for Houston County,**          )
**VANESSA WADDELL, in her capacity as**            )
**Chief Clerk of Elections for Floyd County,**        )
**JULIANNE ROBERTS, in her official**                  )
**capacity as Supervisor of Elections and**          )
**Voter Registration for Pickens County,**             )
**JOSEPH KIRK, in his official capacity as**          )
**Elections Supervisor for Bartow County,**           )
**and GERALD MCCOWN, in his official**               )
**capacity as Elections Supervisor for**                 )
**Hancock County,**                                                  )
                                                                              )
      **Respondents.**                                          )
                                                                              )

---

## DECLARATION OF CHARLES STEWART III

1.     My name is Charles Stewart III.  I am over the age of 21 and am competent to give this Declaration.  My opinions set forth below are based on my personal knowledge and professional expertise.

2.     I am the Kenan Sahin Distinguished Professor of Political Science at the Massachusetts Institute of Technology, where I have been on the faculty since 1985. In that time, I have done research and taught classes at the graduate and undergraduate levels in the fields of American politics, research methodology, elections, and legislative politics.

3.     I received my B.A. in political science from Emory University in 1979, my S.M. in political science from Stanford University in 1981, and my Ph.D. in political science from Stanford University in 1985.

4.      Since November 2020 I have been a member of the Caltech/MIT Voting Technology Project (VTP). The VTP is the nation's oldest academic project devoted to the study of voting machines, voting technology, election administration, and election reform. I have been the MIT director of the project for 15 years.

5.      I am the founding director of the MIT Election Data and Science Lab (MEDSL), which was founded in January 2016. MEDSL is devoted to the impartial, scientific analysis of elections and election administration (sometimes called election science) in the United States.

6.      I have been the author or co-author of numerous peer-reviewed publications and books in political science, and in particular, the area of election administration and election science.

7.      I have been accepted as an expert witness in three cases in federal district court that have involved record linkage and matching between voter files and other data sources, such as driver's license files. These cases were *Florida v. Holder* (1:11-CV-01428), *South Carolina v. Holder* (1:12-CV-203), and *U.S. v. North Carolina* (1:13-CV-861).

8.      I have attached an abridged version of my curriculum vitae to this statement, as Appendix 1.

9.      As a part of my academic research, I have regularly designed public opinion surveys to probe questions related to the conduct of elections in the United States. I have been the principal investigator of modules pertaining to election science that were part of the Cooperative Election Study in 2012, 2013, 2014, 2016, 2018, 2019, and 2020.

10.     I was the principal investigator of the project that led to the creation and design of the Survey of the Performance of American Elections (SPAE).  The SPAE is the only large-scale academic survey that focuses on the experience of voters in federal elections.  I supervised the

3

development of the survey instrument and the reporting of the results. This survey, which interviews over 10,000 voters following every presidential election, has been implemented following the 2008, 2012, 2016, and 2020 elections.

11.     My work on this report has been performed without compensation.  My standard rate of compensation is $500 per hour.

**Summary**

12.     I have reviewed the reports written by Mr. Matthew Braynard, Mr. Bryan Geels, and Mr. Mark Alan Davis submitted in this case.

13.     Mr. Braynard's report primarily rests on matching Georgia voter files with other data files in an attempt to uncover fraudulent voting in Georgia during the 2020 general election. This database matching relies on procedures that are known to be unreliable and to produce a preponderance of "false positives."  Mr. Braynard's conclusions, therefore, are unreliable and without merit.

14.     Mr. Geels filed two reports.  The first primarily involves the inspection of Georgia voter files for the purpose of uncovering anomalies with the dates in the files.  The anomalies Mr. Geels uncovers are generally minor typographical and clerical errors that are neither signs of fraudulent behavior nor lax control over election administration in the state.  He discusses other seemingly major anomalies that, upon even cursory examination, are either better characterized as benign errors or, in a few cases, suggest errors of analysis or ignorance of Georgia law on the part of Mr. Geels.  Mr. Geels also performs some database matching that relies on the same discredited matching procedures employed by Mr. Braynard. Mr. Geels's conclusions, therefore, are unreliable and without merit.

15.     Mr. Geels's second report covers the absentee-ballot rejection rate in Georgia. That report displays basic data about rejection rates over the past several statewide elections.  It draws negative inferences about the decline of rejection rates in 2020 that are unfounded.

16.     Mr. Davis's report also examines Georgia voter files, matching them with outside data such as the National Change of Address (NCOA) registry, in an attempt to document vote fraud.  Mr. Davis provides practically no details about the methods used to reach his conclusion. To the degree his matching methodology is revealed, it is the same discredited technique used by Messrs. Braynard and Geels.  Mr. Davis's conclusions, therefore, are unreliable and without merit.

17.     None of the authors of these reports are experts in the field in which they offer their opinions, as is evidenced by their lack of training and professional experience in database matching and election administration, by their failure to acknowledge the scientific literature in the field, and by their failure to acknowledge limitations inherent in the analysis they perform.

## Mr. Braynard's Report

18.     Mr. Braynard's claims can be summarized as follows:

a.   4,926 absentee or early voters were no longer legal residents of the State of Georgia when they voted, due to their subsequent voter registration in another state. (¶12)

b.   15,700 voters may have vacated their residence in the State of Georgia, as evidence by their filing of a National Change of Address form to an address in another state. (¶12)

c.   1,043 early and absentee ballots were cast by voters who were illegally registered using a post office box disguised as a residential address. (¶13)

5

    d.  395 individuals in the State of Georgia voted in Georgia and another state. (¶14)

**Matching between voter files and other databases is prone to error, owing to their size and the lack of unique identifiers. Mr. Braynard fails to acknowledge this challenge and appears to be ignorant of the scientific literature that has arisen to meet this challenge.**

19.    The basis of Mr. Braynard's opinions derives from database matching between what he claims to be voter files and datafiles provided by the United States Postal Service. Assuming for the moment that Mr. Braynard is in fact using data from the Georgia Secretary of State, database matching—sometimes called "record linkage"—involving voter files is known to be error-prone. This is because the sheer size of the data files in question can be unwieldy, and because one rarely has shared unique identifiers in the files being matched.

20.    The lack of unique identifiers across databases means that there are heightened risks of producing *false positives* and *false negatives* when performing matching analysis.

21.    A *false positive* is when an individual in database A is incorrectly matched to an individual in database B, perhaps because they happen to share the same first and last name. False positives can be minimized by including distinguishing information, such as a middle initial, a date of birth, or address. Doing so makes matches more precise.

22.    A *false negative* is when there is an individual in database A who is not matched to his or her record in database B because of inconsistencies in how the matching variables are maintained in the two databases—for instance, when the same individual's name is recorded as "Bob Smith" in one database and "Robert Smith" in the other. False negatives can be minimized by employing matching procedures, or algorithms, that iteratively employ augmented data fields in a systematic manner. For instance, names might be matched based on phonetic similarity or nicknames might be converted to given names.

23.     Voting files, such as those maintained by the Georgia Secretary of State and made available to the public, have unique identifiers that allow users to match individuals across the files.  Georgia assigns a unique voter identification number to each registered voter.  This number appears in the data files at issue in this case.

24.     In the United States, the Social Security number (SSN) is the closest thing to a unique identifier to aid in the matching across databases that have been assembled for unrelated administrative reasons, despite the fact that the SSN was not designed for this purpose.  In 2010, a committee of the National Academy of Science recommended the use of the SSN as the gold standard in database matching involving voter files.[1]

25.     An alternative to the SSN that is nearly as good when working with the voter file of a single state is the driver's license number.  Because of the utility of having unique identifiers in conducting list maintenance and other election administration activities, the Help America Vote Act requires states to include a request for the driver's license number or last four digits of the Social Security number (SSN4).[2]  Neither of these numbers are made available in the public data files published by the Secretary of State.

26.     Because publicly available voter files lack unique identifiers that facilitate matching with non-voter-file databases, the scientific community has developed alternatives that perform nearly as well as matches with SSN4 or driver's license numbers.  The most widely used technique is the "ADGN" method described by Ansolabehere and Hersh in the journal *Statistics and Public Policy.*[3]

---

[1] National Academy of Science, Committee on State Voter Registration Databases, *Improving State Voter Registration Databases: Final Report,* 2010, https://www.nap.edu/catalog/12788/improving-state-voter-registration-databases-final-report.
[2] Help America Vote Act, 42 USC 15482.
[3] Stephen Ansolabehere and Eitan D. Hersh, "ADGN: An Algorithm for Record Linkage using Address, Date of Birth, Gender, and Name," *Statistics and Public Policy,* vol 4, no. 1 (2017), pp. 1 – 10.

27.     Even when researchers have access to databases with unique identifiers, it is standard practice to do spot checks, to ensure that the match has performed as expected.  This is especially important, though, when researchers do not have access to unique identifiers, because the risk of false positives and negatives is so much greater.  Although, to my knowledge, there is no scientific consensus on a precise method to engage in such spot checks, most would agree that the best approach is to take a random sample of one's matches and independently verify the quality of the match using independent information.

28.     Despite the well-known challenges to database matching involving voter files, Mr. Braynard fails to acknowledge the state of the art in the field and undertakes the most unreliable matching method that is known to experts, that is, a match of name and birthdate (Braynard Report, ¶24).  Elsewhere, he refers to employing "strong matches," which has no meaning in the field (Braynard Report, ¶18).  By the context, I assume he is referring to the name + birthdate.

29.     In ¶24, Mr. Braynard states he matched based on birth *date*.  However, the public Georgia voter registration file reports only birth *year*.  If he in fact matched using the public data, referring to it as birth *date* is misleading.  If he did have access to birth *date,* it was added by an external source that was likely L2.

30.     In ¶24, Mr. Braynard states he matches on "full exact name." The term "full exact name" is ambiguous, since it can refer to a number of name combinations:  first name + last name, first name + middle name + last name, first name + middle initial + last name, first name + last name + suffix, etc.  The description of the matching criteria with respect to the name field is so imprecise as to make it impossible to judge whether the search is overly broad or overly narrow.

8

31.     The name + birthdate (N+DOB) match is a highly inaccurate matching algorithm with voter files because the files are so large and so many voters share names—even people born in the same day. This yields a problem with *precision* in record linkage, which is the measure of matches across datasets that are true matches.  In other words, with so many voters sharing names and birth dates, it is impossible to know *which voter* from the voter file corresponds with the voter in the other file.  Large numbers of false positives are virtually guaranteed.

32.     To illustrate the practical problem for Mr. Braynard's analysis, consider the Georgia voter file.  In September 2020, I purchased a copy of the Georgia voter file from the Secretary of State, to use in my academic research.  That file, dated September 9, 2020, contains 7,346,219 records.  Of these, 7,280,948 are unique name + birth year combinations, leaving the remaining 65,271 registrants sharing a first name, middle name, last name, and birth year with *at least* one other voter.

33.     If a set of voters with common names and birthdates from Georgia are matched with even one registered voter outside of Georgia, what procedures did Mr. Braynard use to determine whether the "correct" Georgia voter had been matched?  Because Mr. Braynard was matching to the voter files of another 49 states, the problem of encountering imprecise matches among all the other states' voter files is even greater.  So, what procedures did Mr. Braynard use when a Georgia with a unique name + DOB combination matched with a set of voters outside of Georgia who all shared that combination?  Mr. Braynard fails to even acknowledge this very serious issue, much less specify how he judges the quality of his matches in general.[4]

---

[4] The problem I discuss here is related to the well-known "birthday problem" paradox, and has been explored in the scientific literature for its applicability to matching with voter files.  See, for instance, Michael P. McDonald and Justin Levitt, "Seeing Double Voting:  An Extension of the Birthday Problem," *Election Law Journal*, vol. 7, no. 2 (2008), pp. 111 – 122.

34.     A core value of scientific research is replication.  In order to ensure replication of research, it is necessary to clearly identify one's data.  Mr. Braynard fails to do this.  For instance, Mr. Braynard claims to have used voter registration records and mail-in and early in-person absentee voter records, "as maintained on the Georgia Secretary of State's website" (Braynard Report, ¶5).[5]  Elsewhere, he states that he received these files from the company L2 Political, which made them available to Mr. Braynard, presumably for a fee.  L2 is known to augment state datafiles, so that they are useful to their primary clients, political campaigns.  Among these augmentations are changing information in data fields based on data from commercial datasets.  If Mr. Braynard is in fact relying on files obtained by L2, rather than received directly from the Secretary of State's office, he has failed to discuss the degree to which the L2 data match the raw data available from the Secretary of State.  At the very least, this imprecision makes the confident replication of Mr. Braynard's research impossible.

**Mr. Braynard's claim that 4,926 absentee or early voters were no longer legal residents of the State of Georgia when they voted, due to their subsequent voter registration in another state, is unreliable.**

35.     In ¶12 of Mr. Braynard's report, he claims that 4,926 *absentee or early voters* [my emphasis] were no longer legal residents of Georgia when they voted, because they subsequently registered in another state after they voted in Georgia.  In ¶20, where Mr. Braynard provides details of the analysis, he reports comparing Georgia's *voter registration file* [my emphasis] to the nationwide L2 voter list.  The voter registration and absentee ballot files are different.  The voter registration file contains no information about the mode a voter used to cast a ballot.  Because the *claim* he makes in ¶12 is about absentee and early voters, I assume he is actually

---

[5] The voter registration file is not, in fact, maintained (more accurately, downloadable) on the Secretary of State's website.  One can *request* the file and, for a fee, later receive a link that allows you to download it.

referring to the absentee voter file.[6]  However, it is impossible to tell for sure from the text of the report.

36.     Mr. Braynard does not mention in ¶20 the algorithm he used to match the voter registration (or absentee ballot) file with the registration databases of other states.  However, Mr. Braynard mentions using the N + DOB algorithm in the second part of that paragraph, when he discusses matching with the NCOA database.  Therefore, I assume he used that algorithm in matching with the other states' registration databases, as well.

37.     The match that Mr. Braynard describes in ¶20 appears to include people who may have moved from Georgia long ago and then returned—if, in fact, the matches are accurate.  Attached to his report is Appendix 2, which is described as the output of the match that produced the 4,926 Georgians on his list.  I translated this appendix into a form that could be read into a statistical package[7] and examined the dates when the individuals are indicated to have registered in Georgia and then a second state.  I discovered, first, that the number of distinct people on the list appear to be closer to 4,600.[8]  Of these individuals, 1,465 have a date indicating a registration in the second state that occurred in 2010 or before; 300 are from 2000 or before. Only 164 bear a date of 2020 and 285 bear a date of 2019. It is clear that Mr. Braynard has conducted a search that is overly broad in its chronological reach.

38.     As discussed above, this matching algorithm is very imprecise and is prone to producing false positives, owing to the large number of people who share names and birthdates.  If over 65,000 registered Georgians share first names, last names, and birth years with each

---

[6] However, a literal reading of ¶20 suggests Mr. Braynard may be referring to all voters, not just early and absentee voters.  This would, of course, contradict the claim in ¶12, but would make sense in light of the second half of ¶20, which explicitly refers to the absentee files.
[7] I first translated the file into an Excel spreadsheet using the program Able2Extract.  I then imported the spreadsheet into the statistical package Stata, version 16.
[8] For instance, there are 4,617 distinct combinations of first name, last name, suffix [sic], street address, city and state in the appendix.  I am assuming the field labeled "suffix" is actually the middle name.

other, it would be unsurprising that 4,926 Georgians would share names and birthdates with voters in other states who happened to register in the weeks leading up to the 2020 general election.

**Mr. Braynard's claim that 15,700 voters may have vacated their residence in the State of Georgia, as evidenced by their filing of a National Change of Address form to an address in another state, is unreliable.**

39.     In ¶20, Mr. Braynard provides what passes for a description of his analysis that led him to the conclusion that 15,700 voters had "vacated their residence in the State of Georgia" by filing an NCOA form to an address in another state.  The description of the matching procedure is so imprecise that it is impossible to judge his findings with any certainty.  First, as with this prior analysis, he provides no details about how he matched the absentee voter files with the NCOA database.  How did he prepare the datasets for matching, what data fields did he use to match, how did he deal with potential duplicates, and how did he verify the precision of his match?

40.     There are well-known problems in relying on matches with individuals to the NCOA database.  One of these is the fact that household members may share the same name, meaning that a match may not be precise.  Another is that individuals of households may be inadvertently included in the NCOA request.

41.     In addition to the matching problems, there is the simple problem that there may be legitimate reasons for someone to file an NCOA request and yet retain their Georgia residency.  Obvious cases include members of the military, students, vacation-home owners, and those on extended temporary assignments for business reasons.

42.     Finally, Mr. Braynard notes in ¶20 that he accounted "for moves that would not cause an individual to lose their residency and eligibility to vote under state law (i.e., by reducing

the total number of moves by a reasonable percentage likely attributable to an educational or military relocation.)"  This describes a completely opaque and arbitrary correction that fails to meet standards of scientific rigor.  What criteria were used to account for educational and military relocations?  What amounts to a "reasonable percentage?"  This type of *ad hoc* adjustment, without clear description or foundation in the scientific literature, and is inconsistent with scientific methodology underscores the overall unreliability of his analysis.

**Mr. Braynard's opinion that 1,043 early and absentee ballots were cast by voters who were illegally registered using a post office box disguised as a residential address is unreliable.**

43.   Mr. Braynard characterizes the 1,043 individuals identified in this search as "disguising" their true address by using a post office box or commercial facility.  He does so without investigating further the situations of the voters who he has identified.  I have learned, through my twenty years of research into election administration and learning from election officials, that voters in highly mobile or marginal circumstances are often uncertain about how to properly fill out the forms related to registering to vote.  For instance, despite the fact that in Georgia, homeless individuals are instructed to indicate where they "lay their head" on their registration form, doing so may be stigmatizing to that individual.  A student who has just graduated and is in between residences might incorrectly believe they can use a P.O. box on their application form.  Finally, it is common to find that some voters *do* live in commercial facilities—sometimes in ways that conform to local building codes, and other times not.  The fact that 0.1% of Georgia voters might fit into one of these categories is hardly evidence of widespread fraud, or even an intent to evade the law.

44.     Furthermore, Mr. Braynard relies on unreliable algorithms to conduct the matching and provides no information about how he confirmed that his matches were precise enough to warrant his conclusions.  Therefore, the analysis is unreliable.

**Mr. Braynard's claim that 395 individuals in the State of Georgia voted in multiple states is unreliable.**

45.     Mr. Braynard's claim of evidence about 395 individuals from Georgia voting in multiple states is unreliable for at least four reasons.

46.     First, Mr. Braynard fails to give a full accounting of the matching protocol used.

47.     Second, in Mr. Braynard's description of the matching process, he claims that he matched "on full exact name and full *exact* date of birth" (¶24; emphasis added).  However, as I have already noted (¶29, above), the Georgia voter file only has birth *year*, rather than full birth date.  Therefore, Mr. Braynard must either be mis-describing the match he undertook or is using a source of information about birth dates he has not disclosed.

48.     Third, as I have already noted (¶30,above) the term "full exact name" is ambiguous, since it can refer to a number of name combinations.  The description of the matching criteria with respect to the name field is so imprecise as to make it impossible to judge whether the search is overly broad or overly narrow.

49.     Fourth, the matching strategy Mr. Braynard uses has regularly been shown to be worthless as a method for quantifying the degree of double voting.  For example, in a 2020 article in the *American Political Science Review,* Sharad Goel and colleagues show that three million pairs of vote records in a national voter registration file obtained from TargetSmart[9]

---

[9] TargetSmart is a competitor of L2 in providing so-called national voter lists to political clients.  As with L2, TargetSmart augments data from commercial vendors, including imputing birthdates for states, such as Georgia, that do not include the full birthdate in their voter file.

14

shared first name, last name, and birthdate.[10]  However, when more precise indicators are applied to increase the precision of the matches, it was shown that 97% of these seemingly duplicate records were in fact distinct individuals.[11]

50.     Similarly, in 2018 the New Hampshire Secretary of State presented a report to his state's Ballot Law Commission concerning 94,000 people from New Hampshire that shared first name, last name, and birthdates with individuals who voted in other states.[12]  After intensive investigation of these cases, which involved 817 hours of investigator time, this list was whittled down by the Secretary of State and Attorney General's offices to 164 voters whose qualifications to vote in New Hampshire had not been verified.

51.     Finally, the research by McDonald and Levitt referenced above in footnote 4, demonstrated that a "finding" that 4,397 persons voted more than once in the November 2004 general election in New Jersey, based on a first name + last name + birthdate match, was an artifact of the "birthday problem" paradox—that is, in even a small number of people, it is virtually guaranteed that at least two people will share the same birthday.

52.     As both the academic and administrative cases illustrate, the matching strategy employed by Mr. Braynard is significantly overbroad and is worthless for quantifying the degree of double-voting between states.

---

[10] Sharad Goel, Marc Meredith, Michael Morse, David Rothschild, and Houshmand Shirani-Mehr, "One Person, One Vote: Estimating the Prevalence of Double Voting in U.S. Presidential Elections," *American Political Science Review,* vol. 114, no. 2 (2020), pp. 456 – 469.

[11] Most importantly, Goel and colleagues were able to add the last four digits of the Social Security number (SSN4) to the match, which allowed them to achieve nearly perfect precision.

[12] John Distaso, "Exhaustive Investigation Reveals Little Evidence of Possible Voter Fraud in NH," *WMUR,* https://www.wmur.com/article/exhaustive-investigation-reveals-little-evidence-of-possible-voter-fraud-in-nh/20955267?wpmm=1&wpisrc=nl_daily202#.

**Mr. Braynard is unqualified to perform and interpret the analysis he reports.**

53.     Mr. Braynard's educational and professional background provide no evidence that he has the qualification to perform the research he conducted, much less interpret the results.  He has no advanced degrees in the social sciences or applied mathematics.  He has never published in this field, and by his admission, he has never been admitted as an expert in court to give his opinions in this area.

### Geels Report # 1

54.     Mr. Geels's first report (Exhibit 3) is primarily a laundry list of trivial (in consequence and number) clerical errors that appear in the Georgia voter and absentee ballot files, none of which provide evidence of widespread voter fraud in the 2020 general election, or in any election, for that matter.  The report focuses on inconsistencies in dates that are found in those files.  In evaluating these consistencies, it is important to keep two things in mind.

55.     First, each file has millions of dates in it, which are the focus of Mr. Geels's report.  For instance, in the voter file in my possession (dated September 9, 2020), there are 42,182,851 different dates recording birth year, registration date, date last voted, date added, date changed, and last contact.  In the most recent absentee ballot file in my possession (dated November 3, 2020), there are 13,168,985 different dates recording the application date, date ballot was issued, and date ballot was returned.  Together, these two files record a total of 55,351,836 dates.

56.     By my count, Mr. Geels lists nineteen "observations" from ¶12 to ¶30 about features of the voter files or results of matches with other files. Of these nineteen observations, 11 are stated as simple facts, left to speak for themselves.[13]  Together, these amount to 7,681

---

[13] These are the claims in ¶¶ 12, 14 – 23.

voters with anomalous dates.  In a voter file of 7,346,219 records, this is 0.1% of all records.  In a set of files that over 55 million dates, that is 0.01% of dates.  While one cannot excuse clerical errors, it is unreasonable to assume that elections—including election recordkeeping—will be perfect.

57.     Nowhere does Mr. Geels suggest how any of these "anomalies" could credibly lead to vote fraud or lack of control, beyond general suspicions.  To draw those conclusions, one would need to account for the multiple safeguards in place in Georgia to ensure that only legal voters may cast ballots.  The record keeping that is the focus of Mr. Geels's report is the *end* of the process, not the beginning, or even middle.

58.     Most of the anomalies identified by Mr. Geels's report—even if one credited them—can readily be explained by a more benign assumption, which is that there is a typo in roughly one out of fifteen thousand dates.  This is not to excuse administrative mistakes, but rather, to put in context how rare most of the so-called anomalies he identifies are.

59.     I do not address the claims that are reference in footnote 13, as they reflect minor recordkeeping errors that are not reflective of fraud, much less *widespread* fraud.

60.     I do address a smaller set of claims, in which either Mr. Geels draws explicit conclusions that cannot be borne by the facts, misrepresents Georgia law, or is based on flawed database matching.

61.     For the claims discussed below, Mr. Geels provides insufficient details about the datasets he matches and the methodology he uses to match the state voter file, voter history file, absentee ballot file, death certificate file, and inmate file.  All files are updated on an ongoing basis.  Mr. Giles does not indicate the date when these files were written, which is a fatal deficiency in many of his analyses.

**Claim:  305,701 individuals have records indicating that they applied for absentee ballots more than 180 days prior to the general election (i.e., prior to May 6, 2020) (¶13).**

62.     The claim that 305,701 individuals in the absentee ballot file is readily explained by the fact that they were entitled to make this request.  Under Georgia law, voters who are physically disabled, 65 years or older, or military or overseas voters may make a "written request to receive an absentee ballot for the primary, primary runoff, election, and election runoff … without having to ask again by specifically stating such on the written request or absentee application."[14]

63.     Ninety percent of those in this group are probably 65 years of age or older.  I came to this conclusion by performing a very basic matching analysis, using versions of the voter file and absentee ballot file that I had previously acquired for my own academic research.  I matched records from the September-vintage voter file with the November absentee ballot file, using the voter identification number as the linking identifier.  This match allowed me to use information from the voter file to calculate the number of ballot requests that were recorded as having arrived before May 6, 2020.  This calculation identified 303,114 requests that fit the criteria, which is very similar to Mr. Geels's 305,701.[15]

64.     Then, again using the voter ID number as the linking variable, I merged these 303,114 records with the absentee ballot file that recorded voters who requested absentee ballots for the *June* primary.  Using the state vote ID number alone, I was able to match 303,097 of

---

[14] Georgia Secretary of State, Elections Division, *Absentee Voting: A Guide for Registered Voters,* v1, 2014.  The current fillable pdf application for official absentee ballot notes, "If you meet one of the described conditions in this section and would like to receive a mail ballot for the rest of the elections cycle without another application, indicate by checking the applicable eligibility requirement."  The categories include elderly (65 years of age or older), disabled, and UOCAVA (military or overseas civilian).
https://sos.ga.gov/admin/files/Absentee%20Ballot%20Fillable%20form%20820.pdf.

[15] Assuming that Mr. Geels also matched on the voter ID number, there is nothing remarkable about our matching results being different, though very close in number.  This difference can easily be accounted for by the fact that the date of the absentee ballot file I was analyzing was different his.

these "early requesters" back to the June absentee ballot file—272,849 (90.0%) of whom were born in 1955 or earlier.  It would be reasonable to assume that the 30,248 absentee voters who were not matched are persons with disabilities or UOCAVA voters.

65.     I further compared the two "ballot request dates" from the match described in the previous paragraph—the ballot request date from the June file and the one from the November file.  Ninety-six percent of those who were 65 or older showed an *identical* application date in both files.  This is a strong indication that the date in the November file is simply carried over from a blanket request made to vote by mail in June.

66.     The conclusion to be drawn from this initial matching exercise is that Mr. Geels has not uncovered anything remarkable at all, other than over 300,000 people who are over 65, disabled, or living overseas who availed themselves of a feature of Georgia election law that is made known to every voter who requests an absentee ballot.

**Claim:  The presence of 4 accepted early or mail votes whose matching record in the registration file has a name that is completely different from the name of the voter in the Absentee Early Voter file shows that "Georgia's voter systems allows a person to vote under another person's registration." (¶23)**

67.     Based on my general knowledge of election administration, Mr. Geels's inference is incorrect.  Because the absentee ballot paper application does not request the voter registration number, the pairing of the paper application with the computerized voter registration list is a manual process.  The pattern Mr. Geels describes is clearly due to clerical error.

**Claim: 66,247 individuals were identified as having cast a ballot whose records indicate that they were registered to vote prior to their 17th birthday. (¶24)**

68.     I have been unable to verify this claim directly, because the copy of the Georgia voter file in my possession is dated to September 2, 2020.  However, in that file, there are 49,893

voters who are identified as having registered *when* they were 17 and only 3,444 *before* they were 17. These latter cases are most likely data entry errors. And in any case, I suspect that Mr. Geels probably made a mistake calculating this measure.

**Claim:  The presence of 6,635 individuals who are recorded as voting in 2016 but who are recorded as registering after 2016 indicates that "the registration was manipulated and is unreliable." (¶25)**

69.     Again, based simply on the results of an imprecise matching strategy, and no further investigation, Mr. Geels jumps to the conclusion that what is likely a clerical error is based on "manipulation."

**Claim:  The presence of 2,024 individuals in the 2020 voter file who have a different birth date than their record in the 2016 voter file indicates that the voter birthdates were unreliable or "manipulated intentionally."**

70.     With any dataset as large and dynamic as the Georgia voter file, clerical errors will occur.  Sometimes those errors will be because of a maintenance activity (such as updating an address) that pertains to the voter at hand; other times, those errors will occur when a worker mistakenly updates the wrong record.  It is because of the imprecision of manual data entry and updating that many states, including Georgia, have adopted automatic voter registration.

71.     In addition, errors in voting files do get corrected.  Mr. Geels provides no information about the likelihood that these changes were corrections of previous errors.

72.     This is the only alleged "finding" in which any of the petitioners' report-writers has reported reaching out to any of the voters whose records appear to be caught up in these anomalies.  Why the particular voter mentioned in ¶26 is mentioned,[16] and not others, is unstated.  Indeed Mr. Geels does not report how many other voters he reached out to who

---

[16] I choose not to mention the name of the voter because I do not wish to subject her to public harassment.

provided information that suggested a more benign explanation for the "fact pattern" he observed.

73.     Mr. Geels states that this particular case cannot be explained by clerical error, "as the birthdate should not change, unless there was valid proof that the birthdate in the Registration records was recorded incorrectly." (¶26)  It is true that the birthdate *should not* be changed, but it is easy to imagine that in the process of updating millions of voter registration records each year, a small number might be changed accidently.

**Claim:  134 individuals with birthdates on or before 1915 are recorded as having voted in the November election. (¶27)**

74.     Mr. Geels reports "researching" the individuals in the voter file who are recorded as having birthdates before 1915.  How he "researched" these individuals is unknown.  Because I do not have the voter file or voter history file from the November 2020 election, I can not check this claim directly.

75.     I examined the September, 2, 2020 version of the voter history file that I have in my possession.  However, in my examination of the September 2020-vintage voter file in my possession, I found that 50 registered voters with birthdates before 1915 were reported as last voting in 2020—6 credited to the March primary and 44 in the June primary.  Twenty-eight of these are recorded with a birthdate of 1900, which is no doubt a placeholder when a worker cannot enter the correct date.  Only three of the remaining 40 voters were first added to the list before 1980.

76.     Almost all of the voters I discussed in the previous paragraph no doubt voted in the November general election.  If Mr. Geels had even done cursory examination of his search results, he would have discovered the pattern I discovered.  I have no doubt that if I were able to

examine the voter file from the November election, the story of the remaining voters would be the same.

**Claim:  10,315 deceased individuals cast ballots in the November 3, 2020 election. (¶28)**

77.     This claim is based on an invalid record linkage strategy that is known to produce numerous false positives. I discussed this issue above at ¶¶19 – 34.  However, unlike Mr. Braynard who may have had access to commercially provided birth *dates,* Mr. Geels, by relying for sure on the publicly available voter file, only had access to birth *years.*  In ¶50, he describes his match as being done on first name, last name, and birth year.  In my analysis of the Georgia voter file, 1,091,659 Georgia voters share an exact match on first name, last name, and birth year.  Based on my search of the CDC WONDER dataset, in 2016 (the most recent year for the data), 79,649 deaths occurred among the 7,519,237 Georgia residents who were over the age of 20.  (The CDC WONDER dataset does not allow one to perform the search on the population that is 18 and older.)  That works out to a crude death rate of 1.06%.  If this death rate is applied to the number of Georgians with duplicate names and birth years, we would expect 11,572 registered voters in Georgia to share the same first and last name of another voter in the state who died.

78.     Mr. Geels himself agrees that "there may indeed be false positives in the population—for example, due to the match of multiple people with a common name who were also born in the same year or to the omission of a suffix." My only disagreement with this statement is that it is incorrect to say there *may* be false positives.  There are *guaranteed* to be false positives—so many, in fact, that they most likely explain the empirical finding entirely.

**Claim:  2,560 individuals who are felons voted (¶29)**

79.     The data linkage strategy described in ¶51 indicates that Mr. Geels performed the data linkage match by performing matching on first name, last name, and birth year.  As I have already noted (see ¶¶19 – 34), this record linkage strategy is guaranteed to produce a result in which the number of false positives vastly exceeds the number of true positives.

80.     Mr. Geels apparently agrees with the sentiment, as he writes in ¶51:  "a more reliable match technique could not be used and there may be false positives included in the population."

81.     The fact that Mr. Geels reports that there *may* be false positives in a match such as this, rather than there *will* be false positives, is indicative of his lack of expertise in the fields of election administration and data analytics.

**Conclusion of assessment of Mr. Geels's report # 1**

82.     Mr. Geels's first report is an example of "straining at a gnat and swallowing a camel."  He expends much energy in pointing out minor, inconsequential clerical errors in an enormous database while ignoring the most important fact his report reveals:  the data are remarkably clean and reliable for the purposes to which they are put.

83.     The claim that Mr. Geels makes that involves the largest, and potentially most significant number of voters, is that over 300,000 absentee voters cast ballots after illegally being allowed to request those ballots more than 180 days before the general election.  That claim has been revealed to be based on ignorance of Georgia law.

84.     Other claims involve smaller numbers of voters and voter records.  In considering these errors, it must be remembered that the various data files explored in his report are *tools* that election officials use to manage the election, but they are not the *only* tools that are used.  The

databases are used to record the actions undertaken by those officials whose actions are guided by multiple safeguards to ensure that only legal votes are cast.  Sometimes the records are updated incorrectly.  It is hard to fathom how a record that indicates, for instance, that a ballot was mailed out before the application was received is indicative of fraud.  Nor is it possible to understand how a massive database with such small numbers of errors of this sort can be regarded as being "unreliable" or evidence of widespread "manipulation."

85.     Mr. Geels concludes his report by offering his opinion that the data the state and county election officials rely on to administer elections are "either not trustworthy" or indicate "a significant number of fraudulent or invalid votes of a magnitude which calls into question the outcome of the Presidential general election."  His report supports no such conclusion.  The most that can be said is that the data files are imperfect—a fact beyond dispute.  However, taken as a whole, the evidence that Mr. Geels produces, to the degree it can be credited at all, points toward a conclusion that is 180-degrees away from the conclusion he reaches. That conclusion is that the data *are* trustworthy and do *not* indicate a significant number of fraudulent or invalid votes which call into question the outcome of the general election.

### Geels Report # 2

86.     Mr. Geels's second report (Exhibit 10) is an analysis of absentee-ballot rejection rates for the 2016, 2018, and 2020 general election and the 2020 June primary.  He documents a decline in the rate of mail-ballot ballot rejections in 2020 compared to the past elections.  He implies that past rejection rates are immutable features of Georgia elections, and that action by the state to reduce those rates must reflect negatively on the quality of election administration in the state.

87.     Mr. Geels relies on absentee ballot datasets that are available for download from the Secretary of State's website.  From my experience using these same files, the statistics he presents in Table 1 are accurate, so far as they report the data from those files.

88.     There are two corrections that need to be made, however.  First, Mr. Geels does not include the datafile reflecting the 65,878 mail ballots that are associated with the March presidential preference primary.  Second, the "spoiled" ballots he includes as "returned" should not be included in this category.  While spoiled ballots are indeed "returned," they are not returned *for counting*.  They are ballots that have been damaged or otherwise unsuitable to vote on, and thus the voter has requested another one.  In the 2020 general election, for instance, of the 4,082 spoiled ballots, 2,865 have the notation "Voter Error" in the "ballot status reason" field.  Eighty percent of the ballots marked as spoiled were issued to a voter who was mailed at least two ballots, with the spoiled ballot canceled and the new ballot eligible to be counted.

89.     Therefore, Table 1 should be modified so that Row 6 consists only of ballots rejected or accepted.  This affects the calculated rejection rates slightly, and barely changes the rejection rates reported by Mr. Geels.

90.     More significant is the fact that Mr. Geels, by implication, casts the significant reduction in rejection rates in a nefarious light, when exactly the opposite should be concluded.  Furthermore, the rejection rate, while much lower than in past years in Georgia, is now in line with other states.  It reflects the result of two salutary developments in Georgia:  the establishment of a robust "cure" process and a vigorous public education campaign undertaken by the state and private citizens.

91.     To put Georgia's past performance in context, I refer to the report of the Election Administration and Voting Survey, which is issued by the U.S. Election Assistance Commission

after every federal election.  The report, and the accompanying jurisdiction-level dataset, are the standard data source used in the fields of election science and election administration to compare states on dimensions such as mail ballot rejection rates.

92.     The report for 2016 indicates that Georgia's ballot rejection rate was 5.77%.[17] The overall national rejection rate was 0.77%.  Georgia's mail-ballot rejection rate was the highest in the country.  For 2018, the Georgia and national rejection rates were 3.10% and 1.42%, respectively.  Only ten states had a higher rate than Georgia's in 2018.

93.     Georgia's poor performance related to mail-ballot rejection rates drew considerable attention from the press, and ultimately the public.  Among other things, it was revealed that counties had widely disparate rejection rates—disparities that could not be attributed to the rejection of fraudulent votes.  For instance, the high rejection rate of Gwinnett County was attributed to a poorly designed absentee ballot forms and decisions to set especially stringent standards for accepting absentee ballots.[18]  (According to the EAVS data, Gwinnett County's rejection rate in 2018 was 6.9%, compared to the 3.10% statewide rate.  The rejection rate across Georgia counties varied from 13.3% in Clay County to no rejections in thirty-two counties.)

94.     In response to dissatisfaction with the rejection rate, the General Assembly passed HB 316 in 2019 which, among other things, provided a formal and uniform mechanism by which

---

[17] U.S. Election Assistance Commission, *The Election Administration and Voting Survey:  2016 Comprehensive Report,* p. 65, *https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf;* EAC, *The Election Administration and Voting Survey:  2018 Comprehensive Report,* p. 64, *https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf.*  Rejection rates reported in the EAVS report will vary somewhat from reports based on raw state reports, because the EAVS survey instrument seeks to reconcile reporting differences across the states, so that an apples-to-apples comparison can be made.
[18] Mark Niesse, "Lawsuit seeks to prevent Georgia absentee ballot rejections," *Atlanta Journal-Constitution,* Nov. 6, 2019, https://www.ajc.com/news/state--regional-govt--politics/lawsuit-seeks-prevent-georgia-absentee-ballot-rejections/svn2eyAwLAMKFbyday1W4J/; Ben Nadler, "Lawsuit challenges absentee ballot rejections in Georgia," *Associate Press,* Nov. 7, 2019, https://newschannel9.com/news/election/lawsuit-challenges-absentee-ballot-rejections-in-georgia.

absentee voters could "cure" deficiencies on the return envelope of absentee ballots.  HB 316 allows voters to "cure a failure to sign the oath, an invalid signature, or missing information by submitting an affidavit to the board of registrars or absentee ballot clerk."

95.     In addition, the state entered into a consent decree concerning the timely notification of voters who had returned mail ballots with deficiencies on the return envelope.

96.     Finally, recognizing that millions of voters across the United States would be casting mail ballots for the first time in 2020, on account of concerns related to the COVID-19 pandemic, vigorous efforts were made nationwide to educate voters about how to properly return their ballots, and to return them on time.  These efforts were undertaken by election officials, citizen groups, traditional media, and social media.

97.     Based on my position as the co-director of the Stanford-MIT Healthy Elections Project beginning in March 2020, I was very aware of these activities, and spoke frequently to reporters about these efforts.  I have no reason to believe that these efforts were any less intense in Georgia than in other states.

98.     Although official data are still being compiled nationwide, Ballotpedia, a website that closely covers election administration issues, has reported on mail-ballot rejection rates across the country, as the statistics have been made available, and has compared those 2020 rates with those in 2016 and 2018.[19]  The table below reports a comparison of rejection rates from 2016 to those in 2020, among states that have reported data from 2020.

---

[19] Ballotpedia, "Election results, 2020: Analysis of rejected ballots," Dec. 11, 2020, https://ballotpedia.org/Election_results,_2020:_Analysis_of_rejected_ballots.

| Comparison of mail-ballot rejection rates, 2016 and 2020 | | |
|---|---|---|
| **State** | **Rejection rate, 2016** | **Rejection rate, 2020** |
| Alaska | 3.17% | 0.87% |
| Connecticut | 1.92% | 0.94% |
| Delaware | 1.54% | 0.21% |
| Georgia | 6.42% | 0.60% |
| Iowa | 0.65% | 0.15% |
| Maine | 0.96% | 0.89% |
| Maryland | 1.49% | 0.63% |
| Massachusetts | 3.30% | 1.30% |
| Michigan | 0.49% | 0.46% |
| Nevada | 1.60% | 0.58% |
| North Carolina | 2.71% | 2.47% |
| Pennsylvania | 0.95% | 0.28% |
| South Carolina | 0.58% | 0.71% |
| Source:  Ballotpedia, https://ballotpedia.org/Election_results,_2020:_Analysis_of_rejected_ballots, Dec. 11, 2020. | | |

99.     With the exception of South Carolina, all states on the chart have seen reductions in rejection rates, many of which have reduced those rates to a fraction of what they were previously.  This includes states as diverse in their election administration practices as Alaska, Connecticut, Delaware, Iowa, Maryland, Massachusetts, Nevada, and Pennsylvania.

100.     In my twenty years in studying election administration, I have had occasion to discuss issues of ballot rejections and "cure" processes with numerous election administrators.[20] Some of these administrators have overseen cure processes for many years.  My conclusion from those conversations is that the consensus among election administrators is that almost all rejected absentee ballots occur because voters make honest mistakes, not because election offices have intercepted fraudulent ballots.  This has led me to understand that high mail-ballot rejection rates, such as Georgia had prior to 2020, represent a failure of election administration.  Any state that seeks to reduce rejections, and does so in a serious, uniform way, should be praised, not

---

[20] One of the reasons I have engaged in these discussions is that the Elections Performance Index (https://elections.mit.edu/#/data/map), which I oversee, assesses the election administration performance of states based, in part, on their ballots rejection rates.  Given this, it is incumbent upon me to understand the underlying issues behind rejection rates, from the perspective of those who administer absentee ballot laws.

criticized.  Mr. Geels's conclusion that high absentee-ballot rejection rates indicates an election administration practice that should be emulated is incorrect.

101.    Based on my experience in the field, the formal cure process in Georgia constitutes a "best practice" that others should emulate.  To expect otherwise is to suggest government policy should be set to automatically disfranchise legal voters who make their best efforts to comply with election law, but nonetheless commit innocent mistakes.

102.    In ¶¶19 and 20 of Mr. Geels's second report, he implies that an *improvement* in the implementation of a law should be receive with opprobrium.  It is as if a tax program that was reformed to reduce cheating on taxes was criticized because fewer tax returns in the future contained questionable itemizations.

103.    In these paragraphs, Mr. Geels criticizes Georgia because it improved its election administration practices.  If Mr. Geels's expectations are accepted, that is, that past policy failures should be accepted as normative, then efforts to make elections more secure and inclusive become impossible.

104.    To conclude, Mr. Geels does an unobjectionable job of calculating rejection rates from data files made available to the public by the Georgia Secretary of State.  Elements of his analysis reflect a profound lack of knowledge about the policy environment in which absentee ballot policy has developed in Georgia over the past year, and a general lack of knowledge about "best practices" in the field of election administration.  His calculations are mostly accurate.  His conclusions and inferences are wrong.

### Davis Report

105.    Mr. Mark Alan Davis provided an affidavit in which he offers observations based on examinations of the Georgia voter file over the past several months.  These observations

claim to reveal data anomalies, such as thousands of votes on the Georgia voter rolls who also appear on the NCOA database.

106.    This report bears none of the marks of an expert report, nor does Mr. Davis's brief description of his background suggest that he is qualified to opine on issues of database management.  He provides no rigorous description of his methodology or data sources.  It is impossible to judge the veracity of his claims or to reproduce his analysis independently.  His report is not science.

107.    To the degree he discusses "hard" results, Mr. Davis reports the results of matches of the Georgia voter file against the NCOA database.  He provides no information about when the database was obtained, nor any precise information about how the matches were conducted. The best he can do is conduct matches based on linking combinations of first name + last name + address, for which there may be innumerable duplicate records.  Furthermore, Georgia law provides legitimate reasons why someone who has filed an NCOA form, as a part of a temporary move, would still retain his or her residency for the purposes of voting.

108.    Mr. Davis's report should be dismissed because of his lack of expertise and his failure to demonstrate that he has based his opinion on recognized methods of database matching.

109.    I declare under penalty of perjury under the laws of the United States of America, and the State of Georgia, that the foregoing is true and correct.

Charles Stewart III                              12/14/20

On this ___ day of _____ 20 __ before me, the undersigned notary public, personally appeared _____ proved to me through satisfactory evidence of identification which were _____, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purpose.
Notary Public _____
My Commission Expires _____

STEPHEN R. GALANTE
Notary Public
Massachusetts
Commission Expires May 25, 2023

30

<div align="center">

**Curriculum Vitae**

**CHARLES HAINES STEWART III**

</div>

Kenan Sahin Distinguished Professor of Political Science
The Massachusetts Institute of Technology
Department of Political Science
Cambridge, Massachusetts   02139
617-253-3127
CStewart@mit.edu

## Education

| | |
|---|---|
| 1985 | Ph.D., Stanford University. |
| 1983 | A.M., Stanford University |
| 1979 | B.A., Emory University |

## Professional experience

*Teaching*

| | |
|---|---|
| 1985–1989 | Assistant Professor of Political Science |
| 1989–1999 | Associate Professor of Political Science |
| 1990–1993 | Cecil and Ida Green Career Development Associate Professor of Political Science (3-yr. term) |
| 1999–present | Professor of Political Science |
| 2007–present | Kenan Sahin Distinguished Professor of Political Science |
| 2016-present | Affiliate Faculty, Institute for Data, Systems, and Society |

*Administrative*

| | |
|---|---|
| 2002–2005 | Associate Dean of Humanities, Arts, and Social Sciences |
| 2002–present | Co-director, Caltech/MIT Voting Technology Project |
| 2005–2010 | Head of the Department of Political Science |
| 2015–present | Director, MIT Election Data and Science Lab |

## Awards (abbreviated)

| | |
|---|---|
| 1994 | Mary Parker Follett Award, for Best Published Essay or Article, 1993-1994, Politics and History Section, American Political Science Association (with Barry Weingast). |
| 1999 | Franklin L. Burdette Pi Sigma Alpha Award, for Best Paper Presented at the 1998 Annual Meeting of the American Political Science Association. ("Architect or Tactician?  Henry Clay and the Institutional Development of the U.S. House of Representatives") |

2002    Jewell-Loehenberg Award, for best article to have appeared in the *Legislative Studies Quarterly*, Legislative Studies Section, American Political Science Association (with Steven Ansolabehere and James M. Snyder, Jr.)

2002    Jack Walker Award, honoring an article or published paper of unusual significance and importance to the field, Political Organizations and Parties Section, American Political Science Association (with Steven Ansolabehere and James M. Snyder, Jr.)

2011    Elected Fellow, American Academy of Arts and Sciences

2013    Patrick J. Fett Award, honoring the best paper on the scientific study of Congress and the Presidency at the previous meeting of the Midwest Political Science Association ("The Value of Committee Assignments in Congress since 1994")

## Grants (abbreviated)

| | |
|---|---|
| 1991–93 | National Science Foundation, "The Development of the Committee System in the House, 1870-1946," SES-91-12345 |
| 2003–06 | John S. and James L. Knight Foundation, "Internet and Electronic Voting" |
| 2005–07 | National Science Foundation, "Collaborative Research: U.S. Senate Elections Data Base, 1871–1913" (with Wendy Schiller). |
| 2007–10 | Pew Charitable Trusts and JEHT Foundation, "The 2008 Survey of the Performance of American Elections" |
| 2008–10 | Ewing Marion Kauffman Foundation, "Congressional and Executive Staff Seminar" |
| 2012–13 | Pew Charitable Trusts, "Measuring Elections" |
| 2013–15 | Pew Charitable Trusts, "Measuring Elections" |
| 2013–14 | Democracy Fund, "Voting in America: Matching Problems to Solutions" |
| 2013–14 | William and Flora Hewlett Foundation, "Voting in America: Matching Problems to Solutions" |
| 2014–17 | Democracy Fund, "Polling Place of the Future" |
| 2016–17 | Pew Charitable Trusts, "The 2016 Survey of the Performance of American Elections |
| 2017–21 | William and Flora Hewlett Foundation, "The MIT Election Data and Science Lab" |
| 2018–21 | Democracy Fund, "The MIT Election Data and Science Lab" |
| 2017–18 | Carnegie Foundation of New York, Andrew Carnegie Fellow |
| 2017–19 | Joyce Foundation, "State Election Landscapes" |

## Publications (abbreviated)

*Books*

2015     *Electing the Senate.* Princeton. University Press (with Wendy Schiller).

2014    *Measuring American Elections*. Cambridge University Press (with Barry Burden)

2012    *Fighting for the Speakership: The House and the Rise of Party Government.*  Princeton University Press (with Jeffery A. Jenkins).

2010    *Committees in the U.S. Congress, 1993–2010.* CQ Press (with Garrison Nelson).

2002 *Committees in the United States Congress, 1789–1946*, 4 vols.  Congressional Quarterly Press (with David Canon and Garrison Nelson).

2001 *Analyzing Congress.*  W. W. Norton. [2nd edition, 2012]

1989 *Budget Reform Politics: The Design of the Appropriations Process in the House, 1865-1921.*  Cambridge University Press.

*Chapters in edited collections*

2020 "Polling Place Quality and Access" (with Robert Stein and Christopher Mann) in *The Future of Election Administration,* eds. Mitchell Brown, Bridgett A. King, and Kathleen Hale. Palgrave MacMillan.

2020 "The Elections Performance Index: Past, Present, and Future" in *The Future of Election Administration*, eds. Mitchell Brown, Bridgett A. King, and Kathleen Hale. Palgrave MacMillan.

2017 "Election Administration in 2016: A Tale of Two Cities" (with Terry Susan Fine) in *Conventional Wisdom, Parties, and Broken Barriers in the 2016 Election*, eds. Jennifer C. Lucas, Christopher J. Galdieri, and Tauna Starbuck Sisco.

2014 "Measuring American Elections" in *Measuring American Elections,* eds. Barry C. Burden and Charles Stewart III.

2014 "The Performance of Election Machines and the Decline of Residual Votes in the U.S." in *Measuring American Elections*, eds. Barry C. Burden and Charles Stewart III.

2014 "Understanding Voter Attitudes toward Election Fraud Across the United States." (With Thad E. Hall) in *Advancing Electoral Integrity*, eds. Pippa Norris, Richard W. Frank, and Ferran Martinez i Coma.

2014 "What Hath HAVA Wrought? Consequences, Intended and Unintended, of the Post-*Bush v. Gore* Reforms," in *Bush v. Gore Ten Years Later,* eds. R. Michael Alvarez and Bernard Grofman.

2011 "Congressional Committees in a Partisan Era: The End of Institutionalization as We Know It?" in *New Directions in Congressional Politics*, ed. Jamie Ll. Carson, Routledge.

2008 "Function follows Form: Voting Technology and the Law," in *America Votes!*, ed. Benjamin E. Griffith American Bar Association.

2008 "Improving the Measurement of Election System Performance in the United States" in *Mobilizing Democracy: A Comparative Perspective on Institutional Barriers and Political Obstacles*, eds. Margaret Levi, James Johnson, Jack Knight, and Susan Stokes, Russell Sage.

2006 "Architect or Tactician?  Henry Clay and the Institutional Development of the U.S. House of Representatives" in *Process, Party, and Policy Making: New Advances in the Study of the History of Congress*, eds David W. Brady and Mathew D. McCubbins, Stanford University Press.

2005 "Congress in the Constitutional System," in *Institutions of Democracy: The Legislative Branch,* ed. Sarah Binder and Paul Quirk, Oxford University Press.

2002 "The Evolution of the Committee System in the U.S. Senate" (with David Canon), in *Senate Exceptionalism,* ed., Bruce Oppenheimer, Ohio University Press.

2002 "Order from Chaos: The Transformation of the Committee System in the House, 1810–1822," in *Party, Process, and Political Change in Congress:  New Perspectives on the History of Congress,* eds. David Brady and Mathew McCubbins, Stanford University Press.

2001 "The Evolution of the Committee System in Congress," in *Congress Reconsidered,* 7th edition, eds., Lawrence Dodd and Bruce I. Oppenheimer.  Congressional Quarterly Press.

1992 "Committees from Randall to Clark," in *The Atomistic Congress,* eds. Ron Peters and Allen Hertzke. M.E. Sharpe.

1992 "Responsiveness in the Upper Chamber:  The Constitution and the Institutional Development of the U.S. Senate," in *The Constitution and the American Political Process,* ed. Peter Nardulli. University of Illinois Press.

1991 "Lessons from the Post-Civil War Era," in *Causes and Consequences of Divided Government,* eds. Gary Cox and Samuel Kernell.  Westview Press.

1991    "Tax Reform in the 1980s," in *Politics and Economics in the 1980s,* eds. Alberto Alesina and Geoffrey Carliner.  University of Chicago Press, pp. 143-170.

*Articles in refereed journals (Abbreviated)*
2020    "Reconsidering Lost Votes by Mail" *Harvard Review of Data Science.*
2020    "Abstention, Protest, and Residual Votes in the 2016 Election," (with R. Michael Alvarez, Stephen Pettigrew, and Cameron Wimpy) *Social Science Quarterly.* 101(2): 925–939. https://doi.org/10.1111/ssqu.12757.
2020    "Protecting the Perilous Path of Election Returns: From the Precinct to the News," (with Stephen Pettigrew) *Ohio State Technology Law Journal* 2020: 588–638.
2020    "Explaining the Blue Shift in Election Canvassing," (with Edward B. Foley) *Journal of Political Institutions and Political Economy* 1(2): 239–265. http://dx.doi.org/10.1561/113.00000010.
2020    "The Relationship of Public Health with Continued Shifting of Party Voting in the United States," (with Jason H. Wasfy, Emma W. Healy, and Jinghan Cui) *Social Science & Medicine* 252(May 2020): 112921. https://doi.org/10.1016/j.socscimed.2020.112921.
2019    "Causal Inference and American Political Development: The Case of the Gag Rule," (with Jeffery A. Jenkins) *Public Choice.* https://doi.org/10.1007/s11127-019-00754-9.
2019    "Learning from Each Other: Causal Inference and American Political Development," (with Jeffery A. Jenkins and Nolan McCarty) *Public Choice.* https://doi.org/10.1007/s11127-019-00728-x.
2019    "Waiting to Vote in the 2016 Presidential Election: Evidence from a Multi-county Study," (with Robert M. Stein, et al) *Political Research Quarterly.* https://doi.org/10.1177%2F1065912919832374.
2019    "Voter ID Laws: A View from the Public," (with Paul Gronke, et al) *Social Science Quarterly* 100(1): 215–232.
2018    "The Deinstitutionalization (?) of the House of Representatives: Reflections on Nelson Polsby's "The Institutionalization of the U.S. House of Representatives" at Fifty" (with Jeffery A. Jenkins) *Studies in American Political Development* 32(2): 166–187.
2018    "Pedagogical Value of Polling-Place Observation by Students" (with Christopher B. Mann, et al) *PS: Political Science & Politics* 51(4): 831–837.
2018    "Learning from Recounts," (with Stephen Ansolabehere, Barry C. Burden, and Kenneth R. Mayer) *Election Law Journal* 17(2): 100–116.
2017    "County Community Health Associations of Net Voting Shift in the 2016 U.S. Presidential Election," (with Jason Wasfy and Vijeta Bhambhani) *PLOS ONE,* Oct. 2, 2017, https://doi.org/10.1371/journal.pone.0185051.
2017    "The 2016 U.S. Election: Fears and Facts about Electoral Integrity," *Journal of Democracy* 28(2): 50–62.
2015    "Partisanship and Voter Confidence, 2000–2012," (with Michael W. Sances). *Electoral Studies* 40: 176–188.
2015    "Waiting to Vote" (with Stephen Ansolabehere). *Election Law Journal.* 14(1): 47–53.
2013    "U.S. Senate Elections before the 17th Amendment: Party Cohesion and Conflict, 1871–1913" (with Wendy J. Schiller and ). *Journal of Politics* 75(3): 835–847.
2013    "Voting Technology, Vote-by-Mail, and Residual Votes in California, 1990–2010" (with Dustin Beckett and R. Michael Alvarez). *Political Research Quarterly* 66(4): 658–70.
2011    "Adding up the Costs and Benefits of Voting by Mail." *Election Law Journal* 10(3): 1–5.
2011    "Voter Opinions about Election Reform" (with R. Michael Alvarez, Thad E. Hall and Ines Levin) *Election Law Journal* 10(2): 73–87.
2006    "Residual Vote in the 2004 Election" *Election Law Journal* 5(2): 158–169.
2005    "Studying Elections: Data Quality and Pitfalls in Measuring the Effects of Voting Technologies" (with R. Michael Alvarez and Stephen Ansolabehere). *The Policy Studies Journal* 33(1): 15–24.

2005    "Residual Votes Attributable to Technology" (with Stephen Ansolabehere). *Journal of Politics* 67(2): 365–389.

2003    "Out in the Open:  The Emergence of Viva Voce Voting in House Speakership Elections" (with Jeff Jenkins). *Legislative Studies Quarterly,* 28(4): 481–508.

2001    "The Effects of Party and Preferences on Congressional Roll Call Voting (with Stephen D. Ansolabehere and James M. Snyder, Jr.). *Legislative Studies Quarterly,* 26(4): 533-572.

2001    "Candidate Positioning in U.S. House Elections," (with Stephen D. Ansolabehere and James M. Snyder, Jr.). *American Journal of Political Science,* 45(1): 136–159.

2000    "Old Voters, New Voters, and the Personal Vote: Using Redistricting to Measure the Incumbency Advantage" (with Stephen D. Ansolabehere and James M., Snyder, Jr.), *American Journal of Political Science*, 44(1): 17–34.

1999    "The Value of Committee Seats in the United States Senate, 1947–91," (with Tim Groseclose), *American Journal of Political Science.* 43(3): 963–973.

1998    "The Value of Committee Seats in the House, 1947-1991," (with Tim Groseclose) *American Journal of Political Science,* 42(2): 453–474.

*Articles in law reviews (last ten years)*

2020    "Protecting the Perilous Path of Election Returns: From the Precinct to the News," (with Stephen Pettigrew) *Ohio State Technology Law Journal* 2020: 587–637.

2016    "Revisiting Public Opinion on Voter Identification," (with Stephen Ansolabehere and Nathaniel Persily) *Stanford Law Review* 68(6): 1455–89.

2013    "Waiting to Vote," *Journal of Law and Politics* 28(4): 439–463.

2013    "Voter ID: Who Has Them? Who Shows Them?" *Oklahoma Law Review* 66(4):  21–52.

2013    "Regional Differences in Racial Polarization in the 2012 Presidential Election: Implications for the Constitutionality of Section 5 of the Voting Rights Act," *Harvard Law Review Forum* 126: 205–220.

2010    "Losing Votes by Mail," in *Journal of Legislation and Public Policy* 13(3): 573-602.

2010    "Race, Region, and Vote Choice in the 2008 Election:  Implications for the Future of the Voting Rights Act." (with Stephen Ansolabehere and Nathaniel Persily)  *Harvard Law Review* 123(6): 1385–1436.

# EXHIBIT B

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DONALD J. TRUMP, in his capacity as a )
Candidate for President, DONALD J. )
TRUMP FOR PRESIDENT, INC., and )
DAVID J. SHAFER, in his capacity as a )
Registered Voter and Presidential Elector )
pledged to Donald Trump for President, )
　 )
      Petitioners, )
　 )
　 )
v. )
　 )
　 )
BRAD RAFFENSPERGER, in his official )
capacity as Secretary of State of Georgia, )
REBECCA N. SULLIVAN, in her official )
capacity as Vice Chair of the Georgia State )
Election Board, DAVID J. WORLEY, in )
his official capacity as a Member of the )
Georgia State Election Board, MATTHEW )
MASHBURN, in his official capacity as a )
Member of the Georgia State Election )
Board, ANH LE, in her official capacity as )
a Member of the Georgia State Election )    Civil Action No. 2020CV343255
Board, RICHARD L. BARRON, in his )
official capacity as Director of Registration )
and Elections for Fulton County, JANINE )
EVELER, in her official capacity as )
Director of Registration and Elections for )
Cobb County, ERICA HAMILTON in her )
official capacity as Director of Voter )
Registration and Elections for DeKalb )
County, KRISTI ROYSTON, in her official )
capacity as Elections Supervisor for )
Gwinnett County, RUSSELL BRIDGES, in )
his official capacity as Elections Supervisor )
for Chatham County, ANNE DOVER, in )
her official capacity as Acting Director of )
Elections and Voter Registration for )
Cherokee County, SHAUNA DOZIER, in )
her official capacity as Elections Director )
for Clayton County, MANDI SMITH, in )
her official capacity as Director of Voter )
Registration and Elections for Forsyth )
County, AMEIKA PITTS, in her official )

**capacity as Director of the Board of** )
**Elections & Registration for Henry County,** )
**LYNN BAILEY, in her official capacity as** )
**Executive Director of Elections for** )
**Richmond County, DEBRA PRESSWOOD,** )
**in her official capacity as Registration and** )
**Election Supervisor for Houston County,** )
**VANESSA WADDELL, in her capacity as** )
**Chief Clerk of Elections for Floyd County,** )
**JULIANNE ROBERTS, in her official** )
**capacity as Supervisor of Elections and** )
**Voter Registration for Pickens County,** )
**JOSEPH KIRK, in his official capacity as** )
**Elections Supervisor for Bartow County,** )
**and GERALD MCCOWN, in his official** )
**capacity as Elections Supervisor for** )
**Hancock County,** )
                                                                            )
      **Respondents.** )
_____ )

## AFFIDAVIT OF CHRIS HARVEY

CHRIS HARVEY, having personally appeared before the undersigned officer, duly authorized to administer oaths, and after being sworn, testifies as follows:

1.

My name is Chris Harvey. I am over the age of 21 and am competent to make this affidavit. The facts set forth below are made upon my personal knowledge.

2.

I am currently employed as the Elections Director with the Election Division of the Georgia Secretary of State's Office. My duties require me to be familiar with several voter databases maintained by the Georgia Secretary of State including the Secretary of State's Voter Registration Files, the Voter Absentee Files and the Voter History Files (collectively "The Secretary of State's Databases"). My duties also require me to be familiar with the statutes, rules and regulations

governing elections in the State of Georgia, including those laws as they related to the November 3, 2020 election for President and Vice President of the United States.

<div align="center">3.</div>

I reviewed the Affidavits of Matt Braynard and Bryan Geels attached as Exhibits 2, 3 and 10 to the Verified Petition to Contest Georgia's Presidential Election Results for Violations of the Constitution and Laws of the State of Georgia, and Request for Emergency Declaratory and Injunctive Relief, filed in the Superior Court of Fulton County, Georgia, Civil Action No. 2020CV343255 ("Verified Petition").

<div align="center">4.</div>

I offer the following preliminary responses to the Matt Braynard's Affidavit,

a. Mr. Braynard states that he relied on several alleged databases, including the National Change of Address Source, which he alleges is maintained by the United States Postal Service ("NCOA database"), the United States Postal Service's list of owned and leased facilities ("USPS Owned and Leased Facilities Report") and a national voter database maintained by an entity described as "L2 Political."

b. The Georgia Secretary of State does not use, rely on or otherwise incorporate the NCOA database, the USPS Owned and Leased Facilities Report, or any database maintained by L2 Political to develop the State of Georgia's Voter Registration Files, the Voter Absentee Files or the Voter History Files. It also does not use the USPS Owned and Leased Facilities Report or any database maintained by L2 Political to maintain any of the State Databases. It will use the USPS NCOA database on occasion to maintain some of its databases.

c. Information contained in the NCOA database, the USPS Owned and Leased Facilities Report, or any database maintained by L2 Political is not, standing alone, sufficient to prove an ineligible person voted in the November 3 election.

d. Information contained in the Georgia Secretary of State Databases standing alone, is also not sufficient to prove an ineligible voter cast a ballot in the November 3, 2020 election except it can functionally serve such a purpose only when the person is listed as "cancelled-deceased", a category Mr. Braynard is not using.

e. Paragraph 18 of Braynard's affidavit refers to "strong matches" between Georgia's early and absentee voter lists to "his national voter file."   Mr. Braynard does not define what a "strong match" is.  Importantly, Mr. Braynard does not allege the "strong matches" are in fact the same people.

f. The Georgia Secretary of State does not invalidate votes or deny ballots to any person.  Counties are responsible for determining the eligibility of a voter and sending absentee ballots.  It would be improper to disenfranchise a Georgia citizen because that voter's information in one database appears similar to information in what Mr. Braynard believes is a "strong match" to information in another database.

g. People considered "strong matches" by Mr. Braynard can subsequently be determined to not be actual matches after investigation. For example, in 2008, allegations were made that approximately 30,000 people in Georgia had voted or requested absentee ballots in two different places.  This allegation was based on apparent matches of people in databases.  I was responsible for investigating

these claims. My investigation determined that of the 30,000 people alleged to have voted or requested absentee ballots in two places, approximately three people actually did vote in two places. And these people all had explanations for doing so, including mental challenges.

h. Paragraph 12 of the Braynard Affidavit claims that 4,926 absentee or early voters were no longer legal residents of Georgia when they voted "[d]ue to their subsequent voter registration in another state." Mr. Braynard also claims that 15,700 voters "may have vacated their residence in the State of Georgia", which he claims is evidenced by their filing of a notice of change of address in another state. He then apparently adds these two numbers together to conclude that 20,312 individuals cast "illegal ballots" in the November 3, 2020 election, though adding the two numbers gives a total of 20, 626.

i. Registering to vote in another state does not necessarily render an individual ineligible to vote in the Georgia November 3, 2020 presidential election. For example, a person could register in Georgia, move, register in another state, then move back to Georgia. In such event, the Georgia Secretary of State Databases may list this person's original registration date in its databases unless the original registration was affirmatively cancelled or cancelled through other legal process.

j. Filling out a change of address form with the United States Postal Office also does not make an individual ineligible to vote in Georgia. Changing an address, even to an out of state address, does not always equal a change of legal residency for many people. For example, college students, military personnel

or mentally handicap persons can submit a change of address form to the USPS, move to another state, but still be considered residents of the State of Georgia. Other people could temporarily move to another state for some purpose, such as caring for a loved one, a temporary work assignment or having a vacation home and still be eligible to vote in Georgia.

k.  Additionally, a cursory investigation of Mr. Braynard's data casts doubt on its accuracy.   The first page of Exhibit 2 to his affidavit ("GA Out of State Subsequent Registration") contains 48 line items of people.   Mr. Braynard testified that every voter on this list has exhibited a "[c]lear indication of their intent to establish residency in another state".  Aff. At ¶20.

l.  I reviewed research results concerning the names and addresses of the 48 people listed on the first page of Braynard Affidavit, Exhibit 2.  This research results reveal that at least 38 of them appear to possibly be currently living in Georgia right now.   Cursory research of the other ten could not establish Georgia residency, but also did not conclusively establish they were residing out of state either.  In other words, preliminary research suggests at least 80% of the people Braynard believed showed a "clear intention to establish residency in another state" still quite possibly appear to live in Georgia.

m. The names are highlighted of the 38 for whom cursory research showed appear to currently reside in Georgia. Those who could not be easily established to have a residency based on a cursory look are not highlighted.   Those highlights appear on **Exhibit 1**.  The people's last names are redacted.

n. Paragraph 13 of the Braynard Affidavit claims that 1,043 early and absentee ballots were allegedly cast by people who were "illegally registered" using a post office box "disguised as a residential address."

o. Listing a post office box as a person's address does not render that person ineligible to vote in Georgia because the person can still reside in Georgia. If a post office box is listed as the voter's address, the voter should update their Georgia voter registration to include a physical address.

p. However, I reviewed research results of a cursory spot check of Mr. Branyard's post office box information that shows it too may be inaccurate for people. Again, a cursory review of the results of the research for the first few pages of addresses Mr. Braynard identifies as being post office boxes are actually apartment or condominium buildings. While researchers did not check all addresses, a few minutes on the computer showed the following address are likely legitimate residential addresses: (1) 5 W. Broughton Street, Savannah; (2) 4920 Atlanta Highway, Alpharetta; (3) 245 N. Highland Ave. NE, Atlanta and; (4) 1700 Northside Drive, Atlanta.

q. Researchers highlighted these addresses taken from Exhibit 4 of Mr. Braynard's Affidavit and they are attached to this Affidavit as **Exhibit 2**. Researchers redacted the people's last names. The sections highlighted appear to be apartment buildings or condominium buildings. Pictures of these buildings are also attached behind the highlighted portion of Mr. Braynard's spreadsheet.

r. Paragraph 23 of Braynard's Affidavit claims 395 peopled voted in multiple states including Georgia. Mr. Braynard claims this is proven by matching

individuals through comparisons of L2 Political databases, which Mr. Braynard does not provide.

    s.   The publicly available Georgia Secretary of State Databases does not contain enough information to determine someone illegally voted twice in two states. Making that determination would require additional investigation beyond matches in various databases even if the matches appear to represent the same individuals, a fact Mr. Braynard has not shown.

<p align="center">5.</p>

With Respect to the Geels Affidavits:

    a.   Geels' Affidavit claims his searching of databases identified what he refers to as "risk buckets." *See* para 34-44. He goes on these describe votes made by people in the various "risk buckets" as either "questionable," "highly questionable," or "extremely risky."

    b.   Geels does not provide the results of his searches. I cannot see who the people are in the various "risk buckets" he discusses.

    c.   The Georgia Secretary of State does not invalidate votes or deny ballots to any person. Counties are responsible for determining the eligibility of a voter and sending absentee ballots. It would be improper to disenfranchise an eligible Georgia voter because the person casting the vote is in a "risk bucket" identified by Mr. Geels that may, or may not, make the vote questionable, highly questionable or extremely risky.

    d.   Paragraph 13 of his Affidavit claims to identify 305,701 individuals with records showing they applied for absentee ballots more than 180 days before

the general election.  Requesting an absentee ballot prior to May 6, 2020 does not necessarily render that individual ineligible to vote in Georgia. For example, O.C.G.A. § 21-2-381 (B) and (D) and O.C.G.A. § 21-2-219, allows certain categories of voters, including disabled, people over 65 years of age and members of the military, to request their ballots more than 180 days before the election. If a member in one of these groups requests an absentee ballot for the primary, they are automatically sent an absentee ballot for the general election. However, the date in which the voter requested this ballot is still listed as the date of the original request in the Secretary of State's databases.

I, Chris Harvey declare that the foregoing is true and correct.

Robin Kiefer
Notary Public
Houston County, Georgia
My Commission Expires 09/25/2022

Executed this 15 day of December, 2020.

_____
Chris Harvey

# EXHIBIT 1

## GA Out of State Subsequent Registration

| county | voterid | lastname | fname | suffix | streetnum | street | city | state | zip | sta2 | rdate_ga | rdate_sta2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COLQUITT | 00380136 | | MARY | ANN | 15 | OLD TRAM RD | MOULTRIE | GA | 31768-6509 | AR | 5/27/1992 | 10/01/2008 |
| JENKINS | 01546598 | | GLORIA | JEAN | 517 | BRIER CREEK CT | MILLEN | GA | 30442 | AR | 1/11/1980 | 10/28/1983 |
| JENKINS | 01546598 | | GLORIA | JEAN | 517 | BRIER CREEK CT | MILLEN | GA | 30442 | AR | 1/11/1980 | 10/28/1983 |
| COWETA | 04878612 | | JENNIFER | LYNN | 65 | MAR MAR LN | NEWNAN | GA | 30265 | AZ | 3/8/2000 | 03/01/2004 |
| HENRY | 04317153 | | REBECCA | LYNN | 5036 | KINGS CT | STOCKBRIDGE | GA | 30281-7966 | AR | 10/4/1988 | 04/29/2019 |
| LEE | 01267509 | | WILLIAM | JEFFERY | 850 | PHILEMA RD S | LEESBURG | GA | 31763 | AR | 2/16/1990 | 11/02/2018 |
| CHATHAM | 04561622 | | CHARLES | EDWARD | 811 | SEBEE AVE | SAVANNAH | GA | 31401-9235 | AR | 10/17/1998 | 10/03/2016 |
| NEWTON | 01384667 | | SALLY | MAE | 30 | STEPHANIE LN | COVINGTON | GA | 30016 | AR | 10/7/1994 | 02/01/2016 |
| TROUP | 00908416 | | TINA | MARIE | 571 | WATERVIEW DR | LAGRANGE | GA | 30240-7723 | AR | 8/30/1994 | 12/20/2019 |
| COBB | 04615945 | | BRYAN | FRANKLIN | 5209 | ELLIOTT RD | POWDER SPRINGS | GA | 30127 | AZ | 10/8/2000 | 02/28/2016 |
| COBB | 06052847 | | MARK | FRANCIS | 5105 | HAMPTON GLEN DR SW | SUGAR HILL | GA | 30518 | CA | 10/3/2004 | 11/01/2018 |
| DEKALB | 08379254 | | TYRUS | NIGEL | 1402 | KNOB HILLS CIR | MARIETTA | GA | 30064 | CA | 10/7/2012 | 08/17/2017 |
| COWETA | 00102601 | | PUALANI | | 29 | REEDEYWEL WALK | DECATUR | GA | 30030 | CA | 11/22/2010 | 11/01/2018 |
| FULTON | 08575663 | | RODNEY | CALVIN | 5540 | DENDY TRCE | NEWNAN | GA | 30265-6207 | CA | 10/29/1988 | 11/18/2003 |
| PAULDING | 03611067 | | JERRY | PAUL | 33 | SILVER TRL | FARBURN | GA | 30213 | CA | 10/7/2012 | 08/01/2019 |
| PAULDING | 03590517 | | BARBARA | KATHREN | 33 | SILVER TRL | DALLAS | GA | 30157 | CA | 3/20/1996 | 09/04/2003 |
| FULTON | 02609637 | | NORMAN | MICHAEL | 1705 | MONROE DR NE | DALLAS | GA | 30157 | CA | 7/16/1992 | 09/04/2020 |
| DEKALB | 03343635 | | SUSAN | M | 1733 | KELLOGG SPRINGS DR | ATLANTA | GA | 30324 | CA | 9/19/1995 | 09/27/2003 |
| FULTON | 04050887 | | DANIEL | DEMETRIOS | 464 | MICHAEL DR | ATLANTA | GA | 30324 | CA | 2/16/1997 | 11/10/2014 |
| GWINNETT | 08539561 | | MELISSA | | 805 | PLEASANT HILL RD NW | LILBURN | GA | 30047 | CA | 10/20/2011 | 01/04/2016 |
| FULTON | 08032906 | | PERRY | ANTHONY | 977 | WILDWOOD RD NE | ATLANTA | GA | 30306 | CA | 5/21/2009 | 09/14/2016 |
| GWINNETT | 10142884 | | NOAHAMIN | ANDARGACHEW | 4999 | APPALOOSA TRL | NORCROSS | GA | 30071 | CA | 12/31/2013 | 03/03/2020 |
| FAYETTE | 01739241 | | DWIGHT | ANDRE | 185 | MILL RUN | FAYETTEVILLE | GA | 30214-3526 | CA | 2/5/1988 | 03/12/2020 |
| DEKALB | 04915600 | | JACARE | JENICE | 2700 | BUFORD HWY NE | ATLANTA | GA | 30324 | CA | 10/8/2000 | 09/22/2008 |
| FAYETTE | 05471426 | | JOSHUA | CHAD | 100 | NICOLE WAY | SENOIA | GA | 30276 | CA | 6/20/2004 | 01/01/2018 |
| FULTON | 07337395 | | LASHIA | PATRICE | 2470 | CAMELLIA LN NE | ATLANTA | GA | 30324 | CA | 1/6/2008 | 08/16/2010 |
| DEKALB | 06998691 | | JUSTIN | THOMAS | 2413 | THAWLEY PL | TUCKER | GA | 30084 | CA | 6/15/2008 | 01/04/2012 |
| FULTON | 10374836 | | BO | | 125 | HEDGEROW TRCE | DULUTH | GA | 30097 | CO | 10/4/2015 | 06/22/2016 |
| COBB | 04697471 | | CLINTON | MILES | 4092 | E SPRING MEADOW DR | ACWORTH | GA | 30101 | CO | 10/8/2000 | 06/19/2017 |
| FULTON | 03325034 | | CRISTINA | | 350 | CARPENTER DR INE | ATLANTA | GA | 30328 | CO | 10/8/1996 | 08/28/2018 |
| HALL | 03551667 | | MARY | BOWDEN | 3480 | GREEN APPLE RD | GAINESVILLE | GA | 30506 | CO | 10/9/1997 | 10/03/2012 |
| HENRY | 01785126 | | JAMES | | 385 | YORKSHIRE JAMES CIR | STOCKBRIDGE | GA | 30281 | CT | 10/5/1992 | 10/23/2008 |
| MUSCOGEE | 01010585 | | JAMES | M | 6856 | COPPER OAKS CT | COLUMBUS | GA | 31904 | CT | 5/15/1984 | 01/17/2012 |
| MUSCOGEE | 01810585 | | JAMES | M | 6856 | COPPER OAKS CT | COLUMBUS | GA | 31904 | CT | 5/15/1984 | 04/06/2012 |
| DEKALB | 03129216 | | ALBERT | W | 1092 | CHANTILLY CRES NE | BROOKHAVEN | GA | 30324-3272 | FL | 9/21/1992 | 08/16/2003 |
| LINCOLN | 06510233 | | JOHN | DENNIS | 1668 | BASSWOOD WAY | TIGNALL | GA | 30668 | FL | 7/19/2005 | 04/08/2013 |
| CAMDEN | 00524938 | | JAMES | STANLEY | 407 | S ARIZONA ST | KINGSLAND | GA | 31548 | FL | 11/19/1975 | 12/05/2011 |
| SEMINOLE | 03904441 | | KELLY | LEIGH | 31 | BASSWOOD WAY | SHARPSBURG | GA | 30277 | FL | 10/6/1996 | 09/30/2011 |
| TIFT | 06415997 | | JIMMY | LEE | 8028 | MALONE DR | DONALSONVILLE | GA | 39845-5344 | FL | 12/10/2004 | 09/30/2011 |
| TIFT | 06907418 | | KAITLYN | MARIE | 4903 | BRIARLEIGH CHASE SW | MABLETON | GA | 30126 | FL | 10/8/2006 | 09/30/2011 |
| GWINNETT | 06835323 | | JESSENIA | | 9 | CLINT CIR | TIFTON | GA | 31794 | FL | 5/17/2006 | 03/07/2012 |
| GWINNETT | 06835323 | | JESSENIA | | 9 | CLINT CIR | TIFTON | GA | 31794 | FL | 5/17/2006 | 03/07/2012 |
| GWINNETT | 08181789 | | MICHAEL | LEONARD | 2567 | INGRAM RD | DULUTH | GA | 30096 | FL | 8/13/2004 | 04/05/2012 |
| GWINNETT | 08181789 | | MICHAEL | LEONARD | 2567 | INGRAM RD | DULUTH | GA | 30096 | FL | 8/13/2004 | 04/06/2012 |
| FORSYTH | 02785940 | | JOSEPH | R | 3596 | ROBINSON CT | LAWRENCEVILLE | GA | 30044-5543 | FL | 1/22/1988 | 06/13/2005 |
| GWINNETT | 07948152 | | PATRICIA | A | 326 | CANTON RD | CUMMING | GA | 30040 | FL | 7/1/2012 | 09/17/2013 |
| JENKINS | 00250807 | | ROSA | MAE | 133 | REEVES ST | MILLEN | GA | 30442 | FL | 7/1/1991 | 07/14/2004 |

DocVerify ID: 00B664EE-3172-454F-9611-8395FDCF5E33
www.docverify.com

Page 18 of 476

188889TDCF5E33

Ex. 2 to Petition:
Braynard Declaration

# EXHIBIT 2

0D8654EE-3172-4549-9513-B8957DCF5E33 — 2020/12/01 12:42:10 -8:00 — Remote Notary

Ex. 2 to Petition:
Braynard Declaration

| Carrier | County | ID | Last | First | Suffix | Address | Unit | State |
|---|---|---|---|---|---|---|---|---|
| USPS | BIBB | | | | | 1040 PIO NONO AVE | APT 2896 | MA |
| UPS | BIBB | 161139 | SUVONEREE | EVANS | | 4339 HARTLEY BRIDGE RD | BOX 215 | MA |
| UPS | BIBB | 5333249 | FRANK | KIDD | III | 5962 ZEBULON RD | APT 169 | MA |
| USPS | BIBB | 3323797 | ROBERT | | JR | 1040 PIO NONO AVE | UNIT 2023 | MA |
| UPS | BIBB | 10345561 | MARC | ANDREW | | 4339 HARTLEY BRIDGE RD | STE  104 | MA |
| USPS | BIBB | 1760838 | MELANIE | R | | 1740 ROCKY CREEK RD | UNIT 20591 | MA |
| UPS | BIBB | 8421878 | KATHERINE | ANN | | 5962 ZEBULON RD | UNIT 163 | MA |
| UPS | BIBB | 812945 | LELAND | K | JR | 4339 HARTLEY BRIDGE RD | APT 216 | MA |
| UPS | BIBB | 5035181 | KATHERINE | ANGELA | | 4339 HARTLEY BRIDGE RD | APT 167 | MA |
| UPS | BIBB | 176527 | VINCENT | LEE | | 3780 NORTHSIDE DR | STE 140 | MA |
| UPS | BIBB | 179993 | DONALD | EDWARD | JR | 4339 HARTLEY BRIDGE RD | UNIT 183 | MA |
| UPS | BIBB | 1001890 | RODREQUEZ | L | | 5962 ZEBULON RD | STE 175 | MA |
| UPS | BIBB | 8327966 | FRANK | M | | 4339 HARTLEY BRIDGE RD | #202 | MA |
| USPS | BRANTLEY | 2243417 | JAMES | | | 10119 MAIN ST N | 805 | NAI |
| USPS | BULLOCH | 6076837 | ERIN | ANN | | 129 E LEE ST | APT 11 | BRC |
| USPS | BUTTS | 11526038 | GERALDO | MARTIN VICENTE | | 461 E 2ND ST | #1304 | JAC |
| USPS | CAMDEN | 12014654 | MARSHA | ANN | | 724 CHARLIE SMITH SR HWY | APT 5402 | SAIl |
| USPS | CAMDEN | 12014654 | MARSHA | ANN | | 724 CHARLIE SMITH SR HWY | APT 5402 | SAIl |
| USPS | CAMDEN | 12549980 | TONY | JAMES | | 724 CHARLIE SMITH SR HWY | UNIT 5734 | SAIl |
| USPS | CATOOSA | 11812818 | ELIZABETH | LUCILLE | | 862 LAFAYETTE ST | UNIT 1625 | RIN |
| UPS | CHATHAM | 1528241 | DOREEN | MARIE | | 5710 OGEECHEE RD | STE 200 | SAV |
| UPS | CHATHAM | 7321565 | JAMAAR | SHA'RON | | 5501 ABERCORN ST | SUITE D214 | SAV |
| FedEx | CHATHAM | 12199576 | REBECCA | | | 5 W BROUGHTON ST | UNIT 305B | SAV |
| UPS | CHATHAM | 11697835 | ANDREW | ROBERT | | 5710 OGEECHEE RD | STE 200 | SAV |
| UPS | CHATHAM | 5609599 | WALTER | MCKINLEY | | 5710 OGEECHEE RD | 200-265 | SAV |
| UPS | CHATHAM | 8500756 | XIN JIAN | | | 5710 OGEECHEE RD | UNIT 150 | SAV |
| UPS | CHATHAM | 8002756 | DARLA | POTTER | | 5710 OGEECHEE RD | STE200-208 | SAV |
| UPS | CHATHAM | 7463225 | KEON | DONTAGUS | | 5710 OGEECHEE RD | #200-202 | SAV |
| FedEx | CHATHAM | 12105784 | ALEXANDRA | FLORENCE | | 5 W BROUGHTON ST | -UNIT.305A | SAV |
| UPS | CHATHAM | 12042290 | KEN | EARL | | 5501 ABERCORN ST | SUITE D-326 | SAV |
| UPS | CHATHAM | 8761840 | DANIEL | HONG-GU | | 5710 OGEECHEE RD | # 200228 | SAV |
| USPS | CHATHAM | 1075107 | FRANCES | EVELYN | | 118 BARNARD ST | UNIT 10703 | SAV |
| UPS | CHATHAM | 2219986 | MARCUS | J | | 5501 ABERCORN ST | STE D205 | SAV |
| USPS | CHATHAM | 5095798 | MELANIE | MARIE | | 1030 US HIGHWAY 80 W | APT#244 | PO |
| UPS | CHATHAM | 7463225 | KEON | DONTAGUS | | 5710 OGEECHEE RD | #200-202 | SAV |
| UPS | CHATHAM | 11093081 | KACI | LEIGH | | 5710 OGEECHEE RD | STE 200-20 | SAV |
| UPS | CHATHAM | 8788281 | AUGUSTA | DEJUAN | | 5501 ABERCORN ST | STE D | SAV |
| UPS | CHATHAM | 12454539 | DIANA | L | | 2126 E VICTORY DR | UNIT 313 | SAV |
| UPS | CHATHAM | 1916108 | CLIFTON | | | 2126 E VICTORY DR | APT 329 | SAV |
| USPS | CHATHAM | 11220744 | STEPHEN | R | | 463 JOHNNY MERCER BLVD | #STE -B 7 | SAV |
| UPS | CHATHAM | 1861860 | MATTHEW | BATES | | 5710 OGEECHEE RD | UNIT # 200 208 | SAV |
| USPS | CHATHAM | 11220744 | STEPHEN | R | | 463 JOHNNY MERCER BLVD | #STE -B 7 | SAV |
| USPS | CHATHAM | 10509083 | JAMES | EARL | | 407 E US HIGHWAY 80 | UNIT 784 | BLC |
| USPS | CHATHAM | 4443137 | JENNIFER | LYNN | | 463 JOHNNY MERCER BLVD | STE B 7 | SAV |
| USPS | CHATHAM | 2243830 | RALPH | J | | 118 BARNARD ST | UNIT 9482 | SAV |
| UPS | CHATHAM | 8740303 | DAVID | WILLIAM | | 5501 ABERCORN ST | STE D304 | SAV |
| FedEx | CHATHAM | 3097079 | JACKIE | MARLENE | | 5 W BROUGHTON ST | UNIT 404 | SAV |

Ex. 2 to Petition:
Braynard Declaration

0D8654EE-3172-4549-9513-B8957DCF5E33 — 2020/12/01 12:42:10 -8:00 — Remote Notary

| Carrier | City | Tracking | First | Last | Suffix | Address | Unit | State |
|---|---|---|---|---|---|---|---|---|
| UPS | FORSYTH | | | | | 82 KEITH BRIDGE RD | # 274 | CU |
| FedEx | FORSYTH | 2143677 | LAMAR | DAVID | JR | 4920 ATLANTA HWY | #310 | AL |
| FedEx | FORSYTH | 8543436 | MARK | A | | 4920 ATLANTA HWY | # 41 | AL |
| FedEx | FORSYTH | 12216618 | THOMAS | DANIEL | | 4920 ATLANTA HWY | UNIT 109 | AL |
| USPS | FULTON | 3947113 | DEIDRA | | | 8920 EVES RD | APT768133 | RC |
| UPS | FULTON | 8651642 | JOHNETTA | REDDIX | | 3000 OLD ALABAMA RD | UNIT 119 | JO |
| USPS | FULTON | 8885003 | STACEY | | | 575 PHARR RD NE | UNIT 52984 | AT |
| FedEx | FULTON | 3477544 | DOROTHY | LITTLEWOOD | | 245 N HIGHLAND AVE NE | UNIT 224 | AT |
| USPS | FULTON | 11570565 | KHALIS | SHAFIQ | | 4575 WEBB BRIDGE RD | UNIT 3344 | AL |
| USPS | FULTON | 11076389 | BROOKE | | | 8920 EVES RD | UNIT 767952 | RC |
| UPS | FULTON | 2123331 | ARDRA | SINETT | | 8343 ROSWELL RD | APT 111 | SAI |
| FedEx | FULTON | 12266763 | LISA | M | | 1700 NORTHSIDE DR NW | STE A7 | ATI |
| USPS | FULTON | 5639813 | AMBER | DANIELLE | | 8920 EVES RD | #767472 | RO |
| FedEx | FULTON | 10623498 | MARTHA | LIGIA | | 245 N HIGHLAND AVE NE | APT 305 | ATI |
| FedEx | FULTON | 5279825 | T L CHEYENNE | | | 245 N HIGHLAND AVE NE | UNIT 230-228 | ATI |
| USPS | FULTON | 8877920 | AELRED | INGRID | | 575 PHARR RD NE | APT 12177 | ATL |
| UPS | FULTON | 5572705 | LATICIA | E | | 2020 HOWELL MILL RD NW | SUIT D-170 | ATL |
| FedEx | FULTON | 4134502 | JOHN | JACOB | | 245 N HIGHLAND AVE NE | APT 312 | ATL |
| UPS | FULTON | 3355996 | CEDRIC | T | | 12460 CRABAPPLE RD | APT 202 | ALF |
| UPS | FULTON | 7178225 | FOROUGH | KHANOM | | 12460 CRABAPPLE RD | UNIT 202-353 | ALF |
| USPS | FULTON | 2644614 | ROBERT | ANTHONY | | 780 MOROSGO DR NE | UNIT 14364 | ATL |
| FedEx | FULTON | 5666320 | LINSEY | ALLISON | | 245 N HIGHLAND AVE NE | #183 | ATL |
| USPS | FULTON | 12497406 | FAJR | ADIA | | 4575 WEBB BRIDGE RD | UNIT 3344 | ALI |
| UPS | FULTON | 5418972 | KAREN | LYNDERA | | 3000 OLD ALABAMA RD | APT 119 | JOI |
| USPS | FULTON | 3290871 | CYNTONIA | MICHELLE | | 575 PHARR RD NE | UNIT 12215 | ATI |
| UPS | FULTON | 10563434 | HENRY | CALVIN | | 2221 PEACHTREE RD NE | D-376 | ATL |
| FedEx | FULTON | 8094779 | WILLIAM | CONRAD | | 245 N HIGHLAND AVE NE | APT 309 | ATL |
| FedEx | FULTON | 11627429 | COLLEEN | ANITA | | 245 N HIGHLAND AVE NE | APT 315 | ATL |
| UPS | FULTON | 3319280 | RHONDA | LASHON | | 10800 ALPHARETTA HWY | SUITE 208 | RO! |
| UPS | FULTON | 3469270 | LORETTA | M | | 2020 HOWELL MILL RD NW | C109 | ATL |
| USPS | FULTON | 10253997 | AMBER | NICOLE | | 4575 WEBB BRIDGE RD | UNIT # 5234 | ALP |
| UPS | FULTON | 1739423 | CURTIS | LEE | JR | 2020 HOWELL MILL RD NW | STE C | ATL |
| USPS | FULTON | 3348711 | MARY | ELLEN | | 4575 WEBB BRIDGE RD | UNIT 5092 | ALP |
| USPS | FULTON | 10268056 | WILLIE | OLIVER | | 4575 WEBB BRIDGE RD | 3172 | ALP |
| USPS | FULTON | 7617065 | KEIONNA | SHAWANDA | | 575 PHARR RD NE | UNIT 12073 | ATL |
| USPS | FULTON | 7195339 | TENEKA | ASHEKA | | 1072 W PEACHTREE ST NW | UNIT 7904 | ATL |
| USPS | FULTON | 5034732 | JAMES | BRYANT | | 8920 EVES RD | UNIT 76772 | RO! |
| UPS | FULTON | 10392329 | CASSANDRA | MICHELLE | | 2221 PEACHTREE RD NE | STE D 503 | ATL |
| UPS | FULTON | 10137684 | ERIC | JOSIAH | | 2260 FAIRBURN RD SW | UNIT310841 | ATL |
| FedEx | FULTON | 7195480 | TINA | | | 2625 PIEDMONT RD NE | UNIT 56381 | ATL |
| FedEx | FULTON | 6242535 | JIMMONIQUE | ALANNA | | 8725 ROSWELL RD | STE O-87 | SAI |
| UPS | FULTON | 11198460 | ANITA | F | | 11877 DOUGLAS RD | APT 102192 | ALF |
| USPS | FULTON | 10602459 | MICHAEL | EVERETT | | 10719 ALPHARETTA HWY | UNIT 1781 | RO! |
| UPS | FULTON | 12094544 | KATRINA | | | 885 WOODSTOCK RD | # 430-203 | RO! |
| USPS | FULTON | 2588308 | MARIAN | LEIGH | | 4575 WEBB BRIDGE RD | UNIT 5234 | ALF |
| USPS | FULTON | 11607357 | DIEGO | M | | 11877 DOUGLAS RD | STE 102 | ALF |
| USPS | FULTON | 6392408 | CHRISTINE | | | 3495 BUCKHEAD LOOP NE | UNIT 115 | ATL |

Ex. 2 to Petition:
Braynard Declaration

0D8654EE-3172-4549-9513-B8957DCF5E33 — 2020/12/01 12:42:10 -8:00 — Remote Notary

| Carrier | County | Number |
|---|---|---|
| USPS | FULTON | |
| FedEx | FULTON | 8339525 |
| FedEx | FULTON | 12279395 |
| FedEx | FULTON | 5736762 |
| UPS | FULTON | 2466914 |
| USPS | FULTON | 11261937 |
| USPS | FULTON | 7336795 |
| USPS | FULTON | 8068005 |
| UPS | FULTON | 2610362 |
| FedEx | FULTON | 8569622 |
| FedEx | FULTON | 10852501 |
| USPS | FULTON | 1227434 |
| UPS | FULTON | 3908725 |
| FedEx | FULTON | 12247100 |
| FedEx | FULTON | 10896756 |
| USPS | FULTON | 10268513 |
| FedEx | FULTON | 7197957 |
| FedEx | FULTON | 11878423 |
| UPS | FULTON | 4448877 |
| FedEx | FULTON | 2663531 |
| FedEx | FULTON | 6937413 |
| FedEx | FULTON | 10735875 |
| UPS | FULTON | 4044708 |
| FedEx | FULTON | 11042950 |
| FedEx | FULTON | 6301866 |
| USPS | FULTON | 11037992 |
| USPS | FULTON | 6828105 |
| FedEx | FULTON | 5561075 |
| FedEx | FULTON | 7546309 |
| FedEx | FULTON | 7469493 |
| UPS | FULTON | 4845027 |
| USPS | FULTON | 4458469 |
| UPS | FULTON | 8205457 |
| UPS | FULTON | 5095241 |
| USPS | FULTON | 5325298 |
| FedEx | FULTON | 7791091 |
| USPS | FULTON | 7195339 |
| UPS | FULTON | 3075515 |
| UPS | FULTON | 6715372 |
| UPS | FULTON | 7369623 |
| USPS | FULTON | 12431502 |
| UPS | FULTON | 3469270 |
| USPS | FULTON | 7955148 |
| FedEx | FULTON | 10949671 |
| UPS | FULTON | 6154932 |
| FedEx | FULTON | 3827127 |
| USPS | FULTON | 10044460 |

| Last | First | Suffix | Address | Unit | City |
|---|---|---|---|---|---|
| | CATHERINE | | 920 EVES RD | UNIT 76766 | RO |
| BENJAMIN | PATRICK | | 245 N HIGHLAND AVE NE | UNIT 306 | ATL |
| BRIANNA | | | 1700 NORTHSIDE DR NW | APT 5503 | ATL |
| ERIC | CARLTON | | 245 N HIGHLAND AVE NE | APT 407 | ATL |
| FREDERICK | COREY | | 12460 CRABAPPLE RD | 202-430 | ALP |
| ANGELA | WILBURN | | 4575 WEBB BRIDGE RD | UNIT 4092 | ALP |
| BERNARD | JERMAINE | JR | 227 SANDY SPRINGS PL NE | APT D421 | ATL |
| APRIL | | | 780 MOROSGO DR NE | #244240 | ATL |
| NICOLE | DANIELLE | | 2020 HOWELL MILL RD NW | # 120 | ATL |
| STEPHEN | | | 245 N HIGHLAND AVE NE | 230-498 | ATL |
| TANGANYIKA | KATARA | | 1700 NORTHSIDE DR NW | APT 5501 | ATL |
| MICHEAL | L | | 240 PEACHTREE ST NW | APT 76432 | ATL |
| MELISSA | | | 6300 POWERS FERRY RD NW | UNIT # 600 | SAN |
| CASSANDRA | LYNN | | 1700 NORTHSIDE DR NW | APT 3608 | ATL |
| JOSEPH | FRANK | | 2625 PIEDMONT RD NE | STE 56-272 | ATL |
| URSULA | HENDERSON | | 4575 WEBB BRIDGE RD | UNIT 5481 | ALP |
| SHAREE | | | 245 N HIGHLAND AVE NE | #230-458 | ATL |
| TYLER | | | 1700 NORTHSIDE DR NW | APT 5602 | ATL |
| DEBORAH | CAROL | | 7742 SPALDING DR | UNIT 397 | NO |
| SABRINA | LAVERN | | 2625 PIEDMONT RD NE | UNIT 56 | ATL |
| MAXINE | | | 2995 E POINT ST | APT 107 | EAS |
| LAUREN | VIRGINIA | | 245 N HIGHLAND AVE NE | #308 | ATL |
| JENNIFER | HOLSTON | | 8725 ROSWELL RD | STE O-121 | SAN |
| TERICA | | | 2020 HOWELL MILL RD NW | APT # 185 | ATL |
| TRAVINA | MELENESSE | | 2625 PIEDMONT RD NE | # 56-255 | ATL |
| LA ROYA | DARSHELLE | | 4575 WEBB BRIDGE RD | UNIT 4272 | ALP |
| JAMES | MICHAEL | | 570 PIEDMONT AVE NE | UNIT 5416 | ATL |
| RHONDA | N | | 245 N HIGHLAND AVE NE | UNIT 230-160 | ATL |
| CHRISTOPHER | | | 2090 DUNWOODY CLUB DR | STE 106 | ATL |
| JOSEPH | EDWARD | | 245 N HIGHLAND AVE NE | UNIT 301 | ATL |
| KRISTEN | LEIGH | | 885 WOODSTOCK RD | STE430-128 | RO |
| ANDREA | COLLEEN | | 575 PHARR RD NE | UNIT 12034 | ATL |
| THELMA | W | | 4279 ROSWELL RD NE | STE 208 | ATL |
| AARON | PAUL | | 2020 HOWELL MILL RD NW | STE D239 | ATL |
| DOUGLAS | DEWAYNE | JR | 5050 UNION ST | APT 804 | UN |
| CHRISTINA | MARIE | | 245 N HIGHLAND AVE NE | APT 419 | ATL |
| TENEKA | ASHEKA | | 1072 W PEACHTREE ST NW | UNIT 7904 | ATL |
| LASENIE | RENAE | | 3000 OLD ALABAMA RD | UNIT 119 | ALP |
| GLENN | PETER | | 2300 HOLCOMB BRIDGE RD | UNIT 103-D3 | RO |
| LORNA | OLIVIA | | 2221 PEACHTREE RD NE | D-150 | ATL |
| QUELYN | | | 240 PEACHTREE ST NW | UNIT 56195 | ATL |
| LORETTA | M | | 2020 HOWELL MILL RD NW | C109 | ATL |
| HAYWOOD | | JR | 2400 OLD MILTON PKWY | 236 | ALP |
| BERNARD | ISIAH | | 2090 DUNWOODY CLUB DR | STE 106 | ATL |
| LINDSEY | MICHAEL | | 1425 MARKET BLVD | STE 330 | RO |
| JAMAH | A | | 2625 PIEDMONT RD NE | # 56-328 | ATL |
| TIFFANY | ILEAN | | 50 SUNSET AVE NW | UNIT 92763 | ATL |

0D8654EE-3172-4549-9513-B8957DCF5E33 — 2020/12/01 12:42:10 -8:00 — Remote Notary

Ex. 2 to Petition:
Braynard Declaration

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| FedEx | FULTON | | | | | | 2625 PIEDMONT RD NE | STE 56-311 | ATL |
| FedEx | FULTON | 8882142 | GLEN | DALE | | 2625 PIEDMONT RD NE | UNIT 56-37 | ATL |
| UPS | FULTON | 184466 | TRACY | DANIELLE | | 6300 POWERS FERRY RD NW | UNIT 269 | ATL |
| UPS | FULTON | 12057410 | ANAJAE | LYNNE | | 10945 STATE BRIDGE RD | APT 4011 | ALP |
| UPS | FULTON | 6491419 | DEMETRIA | H | | 10945 STATE BRIDGE RD | 401-193 | ALP |
| UPS | FULTON | 2673692 | SUNNIE | EDWARD | | 2221 PEACHTREE RD NE | STE 421 | ATL |
| UPS | FULTON | 7011595 | JEREMY | JAMAR | | 2020 HOWELL MILL RD NW | STE D269 | ATL |
| FedEx | FULTON | 8016088 | LAUREN | CAROL | | 1700 NORTHSIDE DR NW | APT 2508 | ATL |
| FedEx | FULTON | 6380400 | TRISTRAM | LEWIS | | 1700 NORTHSIDE DR NW | APT # 2408 | ATL |
| USPS | FULTON | 4248809 | LINDA | | | 4575 WEBB BRIDGE RD | UNIT #2641 | ALP |
| UPS | FULTON | 7536112 | TARA | | | 2221 PEACHTREE RD NE | UNIT 275 | ATL |
| UPS | FULTON | 7910340 | DANIEL | ISAIAH | | 2275 MARIETTA BLVD NW | STE 270 | ATL |
| USPS | FULTON | 8519440 | DANIEL | L | | 227 SANDY SPRINGS PL NE | UNIT # 149-D | ATL |
| USPS | FULTON | 7784867 | WHITNEY | | | 780 MOROSGO DR NE | 14846 | ATL |
| FedEx | FULTON | 10443617 | JULIA | ELIZABETH | | 245 N HIGHLAND AVE NE | APT 402 | AT |
| FedEx | FULTON | 5144874 | NILES | D | | 2625 PIEDMONT RD NE | UNIT 56488 | ATL |
| USPS | FULTON | 12422700 | MYRAH | MARIE | | 1072 W PEACHTREE ST NW | APT 77791 | ATL |
| USPS | FULTON | 2413916 | CAMISHA | L | | 75 WASHINGTON ST | UNIT 931 | FAI |
| FedEx | FULTON | 7724034 | SANDRA | JEAN | | 245 N HIGHLAND AVE NE | 230-183 | ATL |
| USPS | FULTON | 1935327 | RODNEY | A | | 8920 EVES RD | UNIT 76852 | RO |
| USPS | FULTON | 5095241 | AARON | PAUL | | 2020 HOWELL MILL RD NW | STE D239 | ATL |
| USPS | FULTON | 5662679 | HERMAN | EDWARD | JR | 75 WASHINGTON ST | UNIT 1575 | FAI |
| UPS | FULTON | 7199423 | KRISTINA | | | 5805 STATE BRIDGE RD | UNIT # G165 | DU |
| FedEx | FULTON | 11386541 | BENJAMIN | | | 1700 NORTHSIDE DR NW | APT# 5403 | ATL |
| USPS | FULTON | 5028402 | JOHN | GEORGE | JR | 1072 W PEACHTREE ST NW | UNIT 7551 | ATL |
| FedEx | FULTON | 11490980 | CYNTHIA | DIANE | | 1700 NORTHSIDE DR NW | APT 1403 NW | ATL |
| USPS | FULTON | 4904013 | JACK | | | 570 PIEDMONT AVE NE | UNIT 54175 | ATL |
| FedEx | FULTON | 4498123 | JAMES | DAVID | | 245 N HIGHLAND AVE NE | UNIT 211 | ATL |
| USPS | FULTON | 3815917 | PAMELA | M | | 570 PIEDMONT AVE NE | UNIT 54802 | ATL |
| FedEx | FULTON | 6296008 | ALFRED | JERMAINE | | 8725 ROSWELL RD | 136 | SAN |
| USPS | FULTON | 1982990 | JEFFREY | M | | 227 SANDY SPRINGS PL NE | APT# D-75 | ATL |
| UPS | FULTON | 8477220 | LEAH | ALEXANDRIA PUGH | | 2221 PEACHTREE RD NE | STE D | ATL |
| USPS | FULTON | 7344504 | TAWANNA | R | | 848 OGLETHORPE AVE SW | UNIT 11343 | ATL |
| FedEx | FULTON | 8536189 | GEORDANNIS | | | 1700 NORTHSIDE DR NW | APT 3305 | ATL |
| USPS | FULTON | 3445151 | TRACY | RENEE | | 50 SUNSET AVE NW | APT 2301 | ATL |
| USPS | FULTON | 10222941 | JEREMIAH | DEAMOS | | 8920 EVES RD | UNIT 76872 | RO |
| UPS | FULTON | 493063 | JOHN | BYRON | | 3000 OLD ALABAMA RD | 119-128 | ALP |
| USPS | FULTON | 8713529 | SCOTT | MICHAEL | | 650 S CENTRAL AVE | UNIT 82285 | HAI |
| FedEx | FULTON | 8893255 | MAYGHEN | SYMORE | | 2625 PIEDMONT RD NE | STE 56146 | ATL |
| USPS | FULTON | 11005598 | MIA | | | 570 PIEDMONT AVE NE | 55492 | ATL |
| UPS | FULTON | 10355875 | DOLLITIA | GARCIA | | 5805 STATE BRIDGE RD | APT G63 | JOH |
| FedEx | FULTON | 7617584 | EMMANUEL | BERNARD | | 1700 NORTHSIDE DR NW | APT 2206 | ATL |
| FedEx | FULTON | 7231407 | ADAM | MARK | | 245 N HIGHLAND AVE NE | UNIT 230-500 | ATL |
| FedEx | FULTON | 7187601 | JENNIFER | | | 245 N HIGHLAND AVE NE | APT # 155 | ATL |
| USPS | FULTON | 3667802 | GREGORY | | | 570 PIEDMONT AVE NE | UNIT 54837 | ATL |
| FedEx | FULTON | 4024401 | MICHAEL | | | 245 N HIGHLAND AVE NE | UNIT 313 | ATL |
| FedEx | FULTON | 7013684 | AMANDA | LUISA | | 1700 NORTHSIDE DR NW | APT 2203 | ATL |

Ex. 2 to Petition:
Braynard Declaration

0D8654EE-3172-4549-9513-B8957DCF5E33 — 2020/12/01 12:42:10 -8:00 — Remote Notary

| Carrier | County | Number | | | | Address | Unit | City |
|---|---|---|---|---|---|---|---|---|
| FedEx | FULTON | | CHRISTOPHER | MICHAEL | | 2625 PIEDMONT RD NE | UNIT 56347 | ATL |
| UPS | FULTON | 10413932 | | | | 830 GLENWOOD AVE SE | APT 510-255 | ATL |
| UPS | FULTON | 6212910 | LASANDRA | R | | 5805 STATE BRIDGE RD | G429 | DU |
| UPS | FULTON | 6064500 | IRMA | MACIAS | | 2020 HOWELL MILL RD NW | C231 | ATL |
| USPS | FULTON | 5937812 | YASMIN | NAOMI | | 3495 BUCKHEAD LOOP NE | #18601 | ATL |
| UPS | FULTON | 6043260 | MARCUS | LEON | | 2221 PEACHTREE RD NE | STE D 651 | ATL |
| USPS | FULTON | 10595805 | ALVIN | ARNOLD | | 75 WASHINGTON ST | APT 1792 | FAI |
| USPS | FULTON | 6262467 | MESSINA | | | 575 PHARR RD NE | UNIT 52032 | ATL |
| FedEx | FULTON | 7652611 | SEAN | PATRICK | | 245 N HIGHLAND AVE NE | APT 213 | ATL |
| UPS | FULTON | 3678030 | DEBRA | LYNN | | 10945 STATE BRIDGE RD | STE 401 | ALF |
| USPS | FULTON | 10554755 | MYLES | JULIEN | | 227 SANDY SPRINGS PL NE | UNIT D-171 | ATL |
| USPS | FULTON | 10010108 | CRAIG | ALAN | | 2400 OLD MILTON PKWY | UNIT 597 | ALF |
| USPS | FULTON | 2088569 | CORACE | STANLEY | | 1190 N HIGHLAND AVE NE | UNIT 8971 | ATL |
| UPS | FULTON | 11446972 | ISAIAH | DJUAN | | 11877 DOUGLAS RD | STE102-193 | ALF |
| USPS | FULTON | 12760681 | JOHNEITA | | | 227 SANDY SPRINGS PL NE | UNIT # 450 | ATL |
| UPS | FULTON | 5054041 | MEEGAN | DANIELLE | | 2020 HOWELL MILL RD NW | APT 229 | ATL |
| FedEx | FULTON | 5125354 | MARTIN | JOSEPH | | 245 N HIGHLAND AVE NE | APT230-484 | ATL |
| USPS | FULTON | 2140942 | ROBERT | JOSEPH | | 227 SANDY SPRINGS PL NE | D326 | ATL |
| UPS | FULTON | 7022580 | CARL | | | 5805 STATE BRIDGE RD | STE G | DU |
| USPS | FULTON | 8075707 | KIMBERLY | B | | 227 SANDY SPRINGS PL NE | D171 | ATL |
| FedEx | FULTON | 3838088 | FRANK | | | 2090 DUNWOODY CLUB DR | APT106-783 | ATL |
| USPS | FULTON | 4321958 | KIMBERLY | D | | 575 PHARR RD NE | UNIT 11506 | ATL |
| USPS | FULTON | 1988327 | DORETHA | | | 3495 BUCKHEAD LOOP NE | UNIT 18912 | ATL |
| USPS | FULTON | 5042269 | ANTHONY | DAVID | | 227 SANDY SPRINGS PL NE | STE D352 | ATL |
| FedEx | FULTON | 7652611 | SEAN | PATRICK | | 245 N HIGHLAND AVE NE | APT 213 | ATL |
| UPS | FULTON | 7468618 | VICTORIA | KANIELE | | 10945 STATE BRIDGE RD | 401-278 | ALF |
| FedEx | FULTON | 6878625 | CANDICE | MARIE | | 1700 NORTHSIDE DR NW | # 4602 | ATL |
| USPS | FULTON | 12317830 | MODOU | | | 3495 BUCKHEAD LOOP NE | UNIT 18525 | ATL |
| USPS | FULTON | 6451241 | BEVERLY | TURNER | | 848 OGLETHORPE AVE SW | UNIT 11071 | ATL |
| FedEx | FULTON | 11683514 | RAHUL | REDDY | | 245 N HIGHLAND AVE NE | APT 324 | ATL |
| USPS | FULTON | 6374723 | CRISDEION | MARIE | | 794 MARIETTA ST NW | APT 93372 | ATL |
| USPS | FULTON | 6300959 | DERRELL | | | 575 PHARR RD NE | UNIT550165 | ATL |
| FedEx | FULTON | 5193719 | RENEE | | | 2625 PIEDMONT RD NE | UNIT 432 | ATL |
| UPS | FULTON | 7305472 | WILHELM | M | | 3000 OLD ALABAMA RD | STE 119266 | ALP |
| FedEx | FULTON | 3505287 | SHONA | LAQUETTA | | 2625 PIEDMONT RD NE | STE 56-139 | ATL |
| FedEx | FULTON | 11070092 | ADRIANNE | NICOLE | | 245 N HIGHLAND AVE NE | APT # 408 | ATL |
| FedEx | FULTON | 11280327 | NATALIE | JOY | | 245 N HIGHLAND AVE NE | #230-500 | ATL |
| USPS | FULTON | 11187544 | DON | WINZER | | 4575 WEBB BRIDGE RD | UNIT 3491 | ALF |
| FedEx | FULTON | 5889232 | JESSICA | AINSWORTH | | 1700 NORTHSIDE DR NW | APT 1206 | ATL |
| FedEx | FULTON | 6545559 | MICHAEL | SYLVESTER | JR | 2625 PIEDMONT RD NE | STE 56-311 | ATL |
| FedEx | FULTON | 10520251 | QUINTIN | SCOTT | | 8725 ROSWELL RD | APT # 0-93 | SAN |
| FedEx | FULTON | 2648764 | RICKEY | CICERA | | 1700 NORTHSIDE DR NW | UNIT 4207 | ATL |
| FedEx | FULTON | 11058900 | RAYMOND | GUY | | 9925 HAYNES BRIDGE RD | STE 200 | JOH |
| FedEx | FULTON | 12327204 | CONCHETTA | | | 1700 NORTHSIDE DR NW | APT 4-4406 | ATL |
| FedEx | FULTON | 5908794 | GALE | BERNARD | | 2090 DUNWOODY CLUB DR | APT 106 | ATL |
| FedEx | FULTON | 10072126 | LARA | LYNN | | 245 N HIGHLAND AVE NE | 230-491 | ATL |
| USPS | FULTON | 2437910 | DUANE | ALAN | | 1072 W PEACHTREE ST NW | UNIT 79344 | ATL |

**DocVerify ID:** 0D8654EE-3172-4549-9513-B8957DCF5E33
www.docverify.com

Case 1:20-cv-05310-MHC Document 12-17 Filed 01/04/21 Page 84 of 90

**trulia**    Savannah, GA      🔍 ☰

← Back to Search    Sold › GA › Savannah › 31401 › 5 W Broughton St #305A



OFF MARKET

♡ Save    ⬆ Share

📷 12

## 5 W Broughton St #305A

Savannah, GA 31401

North Historic District

**Contact For Estimate**



🛏 2 Beds    🛁 1 Bath    📐 900 sqft

## Local Information



**Map View**
Explore the area around 5 W Broughton St #305A.



**Street View**
Take a virtual walk around the neighborhood.



**Schools**
1 Elementary School
1 Middle School
1 High School



**Crime**
Highest crime relative to the rest of Chatham county.

## Description

**This property is no longer available to rent or to buy.**

Gorgeous 2 bedroom, 1 bathroom condo located above some of the best shopping and restaurants in the city! This unit has an open floor plan, beautiful hardwood floors, exposed brick and high ceilings. Fully modern kitchen with stainless steel appliances, and granite counter-tops! Washer/Dryer in Unit. On Street Parking or Monthly Garage Pass. No Pets/No Smoking. Available NOW! Call 912-704-6242 to schedule showing today!

## Home Details for 5 W Broughton St #305A

| | | |
|---|---|---|
| • Year Built: 1900 | • Dishwasher | • Disposal |
| • Dryer | • Refrigerator | • Washer |
| • Elevator | • Secured entry | • Stainless steel appliances |

See All

## Price Trends

For homes in 31401

*Based on the Trulia Estimate ⓘ

🏠 $320,508
Typical home value

🏠 $271
Typical Home Value by sqft

 

| City, Address, School, Agent, ZIP | 🔍 | 1-844-759-7732 | Buy ▾ | Sell ▾ | Mortgage ▾ | Feed | Real Estate Agents | Log In | Sign Up |



**5 W Broughton St Unit 305B**
Savannah, GA 31401

| **1** | **1** | **550** |
| Bed | Bath | Sq. Ft. |

Built: 1900
Status: Off Market   Source: Public Records



OFF MARKET

📍 Street View

### Is this your home?

Claim this home to track its value
and nearby sales activity

**I'm the owner**

Get a local Redfin Agent's opinion on
your home's value and the state of the
Savannah market.

**Request a free analysis**

OR

Schedule selling consultation

## Homeowner Tools

 **Edit home facts**
Review property details and add renovations.

 **Manage photos**
Update home photos or make them private.

 **View Owner Dashboard**
Track your estimate and nearby sale activity.

## Rental Estimate for 5 W Broughton St Unit 305B

Our gears are turning, but we don't have enough information to generate an accurate estimate at
this time. Learn more about the Rental Estimate.

Edit Home Facts to make sure we've got the right info.

## About This Home

5 W Broughton St Unit 305B is a condo in Savannah, GA 31401. This 550 square foot condo features 1 bedroom
and 1 bathroom. 5 W Broughton St Unit 305B was built in 1900. Nearby schools include Veritas Academy, St
Vincent's Academy and Savannah Christian Prep. The closest grocery stores are Serenity House Tea Society, Ye
Olde Herb Shoppe and Pw Short. Nearby coffee shops include The Coffee Fox, Starbucks and Blends a Coffee
Boutique. Nearby restaurants include Ruan Thai Cuisine, Super Tastes and Good Times Jazz Bar & Restaurant. 5
W Broughton St Unit 305B is near Wright Square, Telfair Square and Johnson Square. This address can also be
written as 5 West Broughton Street Apartment 305B, Savannah, Georgia 31401.

Case 1:20-cv-05319-AHC Document 12-57 Filed 01/04/21 Page 86 of 90

**trulia**

Savannah, GA

← Back to Search | For Rent › GA › Savannah › 31401 › 5 W Broughton St #404



FOR RENT   PET FRIENDLY     ♡ Save   ⬆ Share

📷 11

## 5 W Broughton St #404

Savannah, GA 31401

North Historic District

**$2,180/mo** ↓
~~$2,195~~ ⓘ



🛏 2 Beds   🛁 1 Bath   📐 1,000 sqft

## Local Information



**Map View**
Explore the area around 5 W Broughton St #404.



**Street View**
Take a virtual walk around the neighborhood.



**Schools**
1 Elementary School
1 Middle School
1 High School



**Crime**
Highest crime relative to the rest of the area.

## Description

📱 (912) 999-1114

BROUGHTON STREET LOFT - APPOINTMENT NEEDED TO VIEW

Welcome to loft living! Come home to this 2 bedroom, 1 bath space. Great opportunity to enjoy the perks of downtown urban living. The entire unit has hardwood floors throughout with high ceilings and exposed pipe and duct work. The bathroom has custom cabinets with shower/tub. The kitchen is equipped with stainless steel appliances including double door fridge, built-in microwave, dishwasher, and glass-top stove. The living room has a beautiful view of downtown Savannah. The 4th floor is accessible via stairs or elevator and is located in The Grant Building. This building is not cable ready and only offers Satellite service. Pets negotiable with $300 Pet Fee. (TB110520)

In order for application to be processed, the subject property must be viewed by applicant(s) or by approved proxy. Failure to view the property, will result in your application being returned.

FOR MORE INFORMATION
WWW.MSMSAVANNAH.COM

(RLNE3338511)

## Details for 5 W Broughton St #404

- Days on Market: 39 Days on Trulia
- Parking: None
- Property Type: Multi Family
- Cats, small dogs, large dogs allowed
- Elevator
- Deposit: $2,180

12/14/2020    Inman Park Village Lofts | Atlanta, GA | 245 N Highland Ave ...

Case 1:20-cv-05310-MHC   Document 12-17   Filed 01/04/21   Page 87 of 90





Search by city or building name



# Inman Park Village Lofts

### ABOUT INMAN PARK VILLAGE LOFTS

Known as IPV Lofts, this modern development is a wonderful way to join the Inman Park district at an affordable price. The open concept, multi-story lobby is indicative of the building's casual sophistication. Inman Park Village

...ted and value historic area of Inman Village. These cool lofts sit above retail shops but you're just as close to sidewalk cafes, bars, and all the charm of Inman Park. If you'd rather stay home, you can hang out on the rooftop
...at the gym. In your loft you'll find concrete and steel construction, 10' ceilings, walls of windows, stainless appliances, and large balconies.



**Jamie & Associates - Atlanta**

Atlanta Communities
Call/Text: 404-491-7770

Interested in this building?

Contact Jamie & Associates Today

245 N Highland Ave NE, Atlanta, GA 30307

This site uses cookies to provide you with the best user experience. By using Highrises.com you accept our use of cookies.

See Details    Ok



VIRTUAL TOUR    FLOOR PLANS    SPECIAL OFFER    AMENITIES    VIDEOS    REVIEWS

**CONTACT THIS COMMUNITY**

Berkeley Heights

1700 Northside Drive NW  |  Atlanta, GA 30318

404-905-1973  |  Call   Text

Office Hours:   Today 9:00 AM–6:00 PM

**Resident Brochure**



## Our Leasing Office is Now Open! We look forward to welcoming you!

Berkeley Heights is the original upscale apartment community in Atlanta's flourishing Westside. Featuring the height of style and attention to detail, our residents enjoy a prime location with shopping, dining and retail services right at their front door. With an exceptional array of one, two and three bedroom floor plans appointed to your personal style, Berkeley Heights lets you live, work and play with all the comforts and conveniences of home.

**CONTACT OUR TEAM**

**TAKE VIRTUAL TOUR**

**CHAT LIVE NOW**

## Take a Virtual Tour

Enjoy a virtual tour of Berkeley Heights from the comfort of your home and on a device of your choosing! Please contact our team with any questions you may have.



Berkeley Heights | Gables Residential Communities



  

VIRTUAL TOUR          FLOOR PLANS          SPECIAL OFFER          AMENITIES          VIDEOS          REVIEWS

CONTACT THIS COMMUNITY

Background Checks | Tenant Screening

PEOPLE PHONE ADDRESS BUSINESS

Mark A Israel | Alpharetta GA

Christine Smith

# Mark A [redacted]

(Mark A Alden, Israel Mark)

Monitor

60s Alpharetta, GA

View Cell Phone Number | View Background Report

## Phone Numbers

LANDLINES (7)

(678) 771-8959

(678) 947-9800

Show 5 More

CELL PHONES (6) PREMIUM

View Cell Phone Numbers

Show 4 More

View Mark's Phone Numbers

## Addresses

MARK'S CURRENT ADDRESS

4920 Atlanta Hwy
Alpharetta, GA 30004

Map

OTHER LOCATIONS

Hackettstown, NJ
Lawrenceville, GA
Cumming, GA
Budd Lake, NJ
Gainesville, GA

View Full Address History

We use cookies on this site to enhance the experience. By using the site, you agree to our terms. GOT IT

